**ALFRED DUNHILL LIMITED and Alfred Dunhill of London, Inc.,**
Plaintiffs,

v.

**INTERSTATE CIGAR CO., INC., et al.,**
Defendants.

No. 72 Civ. 3898.

United States District Court,
S. D. New York.

Feb. 7, 1973.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiffs; Victor Friedman, New York City, of counsel.

Hauser & Rosenbaum, Brooklyn, N. Y., for defendants; Noel Hauser, Brooklyn, N. Y., of counsel.

MOTLEY, District Judge.

### Findings of Fact and Conclusions of Law

Plaintiffs seek injunctive relief against defendants for alleged violations of the trademark laws of the United States, 15 U.S.C. § 1051 et seq., and the New York General Business Corporation Law, § 360 et seq., McKinney's Consol. Laws, c. 20. The jurisdiction of this court is invoked pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338.

A temporary restraining order was issued on September 12, 1972. The action came on for a hearing on September 19, 1972 on plaintiff's motion for a preliminary injunction. After several adjournments, the hearing on the motion for a preliminary injunction was ordered consolidated with the trial of plaintiffs' action for a permanent injunction which was held on October 12, 13, and 17, 1972. Permanent injunctive relief is granted for the reasons set forth below.

Plaintiff, Alfred Dunhill of London, Inc., a Delaware corporation (Dunhill, Inc.), is the owner of several trademarks for tobacco products, including "Alfred Dunhill," "Dunhill," "My Mixture," "Dunhill, The Royal Yacht," and "Dunhill, London Mixture," all of which are duly registered. Each of said trademarks is valid and subsisting. Plaintiffs have also used the trademarks "Early Morning," "Aperitif," and "Ye Olde Signe" in connection with sales of Dunhill tobacco. Since 1922, plaintiff Dunhill, Inc., a wholly owned subsidiary of plaintiff Alfred Dunhill, Limited, a foreign corporation, has been the exclusive distributor in the United States of Dunhill products under the above named trademarks.

These trademarks are well known to consumers of tobacco products. Plaintiffs have a reputation for selling high quality products and Dunhill, Inc., annually spends over $100,000 in promoting products marketed under these trademarks. Sales of tobacco and tobacco related products by Dunhill, Inc., have exceeded $4,000,000 in each of the last three years.

On January 22, 1972, Alfred Dunhill, Limited, shipped a quantity of merchandise from England to Dunhill, Inc., in New York. The shipment included 268 cartons of smoking tobacco packed in two and four ounce tins, all bearing plaintiffs' trademarks, and a quantity of smoking accessories, also bearing plaintiffs' trademarks and trade names. Plaintiffs' merchandise was packed in a single 20 foot long container.

The container arrived in New York with a 1 x 2 foot hole in its roof. On or about February 7, 1972, the container was delivered to the warehouse of Dunhill, Inc. At the time of delivery, water was running through the container. Dunhill, Inc., determined that all of the non-tobacco merchandise and 168 cartons containing tobacco products had been subjected to water damage.[1] At the

---

1. Each cardboard carton contained 20 inner cases, packed five deep and four high. Each case contained either four 4 oz. tins or eight 2 oz. tins.

same time, Dunhill, Inc., determined that 100 cartons had not been subjected to water damage based upon the appearance of the exteriors of the large cardboard cartons. These 100 cartons were subsequently sold by Dunhill, Inc., in the normal course of business without special labeling.

Dunhill, Inc., made a claim for the full landed cost of the 168 cartons of tobacco against its insurance carrier, William McGee & Company and Sun Insurance Company in February, 1972. At this time plaintiff Dunhill, Inc., still owned the goods.

Worman & Co., Inc. (Worman), a cargo surveying firm, was engaged by plaintiffs' insurer to examine the claim. Worman inspected the cartons on February 8 and February 10, 1972 at the premises of Dunhill, Inc. The surveyor, James J. Whalen, after having objected to the failure of Dunhill, Inc. to segregate damaged from undamaged *tins*, nevertheless determined that 168 *cases* had been subjected to water damage. Upon being informed that Dunhill, Inc., opposed any sales of the damaged cartons, Whalen suggested to Norair Hartunian, vice president and treasurer of Dunhill, Inc., that Dunhill had a choice of retaining the damaged cartons and being reimbursed for 25 percent of the insured value of the shipment or permitting the insurer to sell the tobacco as salvage. Hartunian eventually agreed to have the tobacco sold as salvage.

Hartunian agreed to permit the tobacco to be sold as salvage because he assumed that the tobacco would be described and sold as salvage. The salvage company had also informed him that it had found a purchaser in West Virginia where the Dunhill name is not known and, consequently, where sales of damaged tobacco would be unlikely to damage the reputation of Dunhill, Inc.

On behalf of the insurer, Worman agreed to pay to Dunhill, Inc., the full invoice value of the tobacco. Worman then engaged United Salvage Company to dispose of the 168 cartons at the best possible price. Worman subsequently instructed Dunhill, Inc., to release the cartons to United Salvage for sale. It then authorized United Salvage to sell the 168 cartons without explicit restrictions as to time, place or circumstances of resale, and without any requirement that the purchaser rebox or relabel the merchandise.

Under the terms of the policy, the insurer was obligated to compensate Dunhill, Inc., fully for its loss, without regard to the amount of the payment the salvage company received for the cartons. Dunhill, Inc., had no control over the terms of the sale of the tobacco by United Salvage. Control, instead, was exercised by Worman which was acting on behalf of the insurer.

The insurance policy did not include label and protection coverage which was offered by William McGee & Company and Sun Insurance Company at an increased premium. Such coverage would have provided that in case of loss or damage to goods bearing plaintiffs' trademarks while the goods were owned by Dunhill, Inc., the insured could require that the trademarks be removed before sale of the damaged goods by the insurance carrier.

On or about June 18, 1972, defendant Interstate Cigar Co., Inc., purchased the 168 cartons from United Salvage for $8,000. Interstate was advised that the tobacco had been subjected to water damage and was being sold "as is—salvage."

After Interstate purchased the tobacco from United Salvage, Michael Spielfogel, secretary-treasurer of Interstate, telephoned Walter Harris, Jr., president of Dunhill, Inc., advised Harris of the purchase and offered to resell or return for credit the salvaged tobacco to plaintiff. Spielfogel testified that he decided to make the offer after determining that it would be difficult for his staff to handle the merchandise.

Hartunian testified that he assumed that Interstate would sell the tobacco once he learned of Interstate's purchase.

Counsel for plaintiffs sent a letter, dated June 23, 1972, to defendant Interstate asking it not to sell the tobacco under the Dunhill name or in the "present containers." Defendant Interstate was warned that if it offered the merchandise for sale, plaintiffs would take appropriate steps " . . . to protect not only . . . [their] client's rights but those of the consuming public." In June, Dunhill, Inc., sent a letter to its wholesale customers advising them that Interstate had purchased tobacco merchandise from an insurance carrier and that the tobacco had been subjected to water damage.

On approximately July 12, 1972, Dunhill, Inc., received from Worman the United Salvage Company's check to the order of Dunhill, Inc., in the amount of $7,559.18, representing the proceeds of the sale by the salvage company of the tobacco and non-tobacco merchandise. On or about August 23, 1972, Dunhill, Inc., received a check from its insurance carrier in the amount of $13,850.33, representing, with minor adjustments, the difference between a) the landed cost to plaintiff of the 168 cases of tobacco and the damaged non-tobacco merchandise and b) the amount received by plaintiff from United Salvage.

On August 9, 1972, plaintiffs' attorneys wrote to Interstate's attorney, Mr. Hauser, warning him that an injunction would be sought unless written assurances were given that the tobacco would not be resold under the Dunhill name as a standard product and that the Dunhill name would " . . . under no circumstances, be associated with any marketing activities involving this shipment." No reply was made to this letter.

Instead, Interstate proceeded to sell the tobacco from June, 1972 through September 12, 1972 when the court issued a temporary restraining order against further sales.

On June 21, Interstate circulated a memorandum among its sales personnel advising them of the purchase of the Dunhill tobacco, stating that the merchandise was salvage, that some of the cans were rusty and dented, but that the tobacco cans were airtight and should be unaffected. Instructions were placed in the sales book of each sales person that customers should be warned that the merchandise was salvage.

Interstate sold a quantity of the tobacco to defendant Seckler Bros., Inc., on or about July 11, 1972. Seckler Bros., Inc., is owned by substantially the same individuals who own Interstate. Interstate sold a quantity of salvaged tobacco to defendant M. Shapiro Sons Smoke Shop, Inc., on or about July 21, 1972 and to at least nine retailers other than the defendants. One of the retail customers was Arnold's Cigar Store in Miami Beach, Florida, which ordered the salvaged tobacco on August 29, 1972. Pursuant to that sale, Interstate shipped tobacco from New York to Florida on September 15, 1972. In several instances, Interstate did not advise its customers that the tobacco was salvage or that it had been subjected to possible water damage.[2] Moreover, several retailers, including defendants Seckler Bros., Inc., and M. Shapiro Sons Smoke Shop, Inc., did not advise retail purchasers that the tobacco was salvaged or had been subjected to water damage. Signs indicating that the tobacco was on special sale at unusually low prices did not give the retail consumer notice that the tobacco might be damaged. Customers might have believed that the lower prices were the result of a "close-out" or were designed simply to lure them into the store.

There is no evidence in the record that agents of Dunhill, Inc. learned that

---

2. The court finds that defendant Interstate did not warn Paul Mole and De La Concha Tobacco Shop, retailers who purchased the salvaged merchandise, that the tobacco had been subjected to possible water damage.

any of the tobacco was being sold to retailers or to members of the public without warnings as to possible water damage until September, 1972.

The court finds that, as a result of the accident at sea, many of the tins were rusted and dented and some of the tobacco was damaged. The testimony showed that Dunhill tobacco is packaged in airtight tins. A vacuum is created and a rubber seal is placed under each lid. After a tin is exposed to water, it is possible for the water to seep underneath the lid creating a rusting action which can cause the rubber seal to deteriorate. The rusting process can take more than a year after the tin has been exposed to water. And even if a tin is still airtight or there is no visible rust on the outside of the tin, there can still be some rusting on the inside top cover of the tin which might ultimately damage the rubber seal. It is, therefore, impossible to determine whether the tobacco itself in any particular can has been damaged without opening each tin. [The process of opening a tin would break the seal causing the tobacco to deteriorate.] Since one of the opened tins introduced into evidence plainly showed damage to the tobacco and other tins introduced were rusted and because defendant Interstate prepared an inventory record (Pl's Exh. 19) which indicated that many of the tins were rusted, the court concludes that it is more likely than not that the contents of some of the tins were damaged. Moreover, the failure of defendants' counsel to turn over this document to plaintiffs' counsel prior to the trial hampered plaintiffs in proving the damaged condition of the tins and tobacco contents. This failure occurred despite an order by the court that plaintiffs and defendants exchange all documents relating to the transaction. Rule 37, Fed.R.Civ.P., permits the court to take into account the failure of a party to comply with a discovery order in deciding whether the other side has satisfied its burden of proof.

The court holds that defendants have violated plaintiffs' rights under the Lanham Act, 15 U.S.C. § 1051 et seq., and that injunctive relief is appropriate to vindicate those rights.

This is not a case in which plaintiffs allege that defendants have reproduced or copied a registered mark. Therefore, there can be no violation of Section 1114.

Instead, plaintiffs claim that defendants have deceived the public in violation of Section 1125(a). That section provides in part:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Plaintiffs contend that selling damaged goods which the manufacturer has repudiated, in their original packaging and without advising customers that the products are salvaged and water damaged, amounts to a false representation to the public as to the goods' origin and quality. Sales under such circumstances, plaintiffs argue, imply that the goods are of the same high quality generally associated with Dunhill trademarks.

Since defendant Interstate caused some of the damaged goods to enter into interstate commerce when it shipped salvaged tobacco to Florida, the goods were placed in commerce within the meaning of Section 1125(a). Moreover, since the goods had originally been shipped from England to the United States, the goods were still in interstate commerce when they were sold by defendant Interstate and defendant retailers. *See* Brown v. Maryland, 12 Wheat. 25 U.S. 419, 6 L.Ed. 678 (1827). There-

fore, the goods bearing the alleged false representations were caused by defendants "to enter into commerce." Since Section 1127 defines "commerce" as " . . . all commerce which may lawfully be regulated by Congress," the term should be construed broadly.

The court further finds that defendants have falsely represented the quality of the salvaged tobacco in violation of Section 1125(a). Sales of damaged tobacco in tins bearing trademarks associated with high quality tobacco, without adequate warnings to customers that the goods are damaged, involve false representations of their quality.

■ False representations can be the product of affirmatively misleading statements, of partially correct statements or failure to disclose material facts. The public can be as easily misled by the purchase of damaged goods in their original containers which the purchasers do not know are damaged as they can be by statements that the goods are not damaged. Thus, the Federal Trade Commission has recognized that sales of used goods or factory rejects can mislead the public into believing that the goods being sold are " . . . new, unused and first quality. . . ." In the Matter of B & C Distributors Co., 55 F.T.C. 866 (1958). *See also* In the Matter of Stanley Electronics Corp., 55 F.T.C. 303 (1958); 16 C.F.R. § 15.343.[3]

■ It is true that the policies underlying the Lanham Act, *supra,* and the Federal Trade Commission Act, 15 U.S. C. § 41 et seq., are somewhat different —the F.T.C. Act is designed to protect both consumers and competitors from deceptive trade practices and the Lanham Act is intended to protect persons engaged in interstate commerce from unfair competition. *See* 15 U.S.C. § 1127. However, the statutes differ principally only with respect to the classes of persons they are intended to protect. Consumers lack standing to challenge deceptive advertising practices under the Lanham Act. But when consumers are deceived by misleading statements and a competitor engaged in commerce can show that it has been damaged by those misrepresentations, it has standing to challenge those practices under the Lanham Act. And it seems clear that the opinions of the Federal Trade Commission, an expert agency charged by Congress with the responsibility of protecting consumers and competitors from unfair trade practices, are relevant where the claim is that deceptions of the public have harmed a person engaged in commerce.

■ Suggestions in some cases that Section 1125(a) prohibits only the practice of "palming off" the goods of the defendant for those of the plaintiff, e. g., PIC Design Corp. v. Sterling Precision Corp., 231 F.Supp. 106 (S.D.N.Y. 1964), are the product of an overly narrow reading of the Act. *See* Sutton Cosmetics (P.R.) Inc. v. Lander Co., Inc., 455 F.2d 285, 287 n. 4 (2d Cir. 1972). It may well be that Section 1125(a) is unwittingly associated with the more conventional trademark violations because " . . . section 43(a) [15 U.S. C. § 1125(a)] is a part of the Trademark Act where, of course it does not logically belong." 1 R. Callmann, Law of Unfair Competition, Trademarks and Monopolies 622, n. 26 (3d ed. 1967). However, Section 1127 makes it clear that the Act was intended to do more than prohibit traditional trademark violations: "The intent of this chapter is . . . to protect persons engaged in such commerce against unfair competition. . . ." It has accordingly been recognized that the Lanham Act created a new federal cause of action for false representation of goods in commerce.

---

3. It is no defense that defendants may have believed the tobacco to have been undamaged and, therefore, did not intend to mislead their purchasers. "[U]nfair competition is a question of fact, and the test is 'whether the public is likely to be deceived.' " Best & Co. v. Miller, 167 F.2d 374, 377 (2d Cir. 1948).

*See, e. g.,* Alum-A-Fold Shutter Corp. v. Folding Shutter Corp., 441 F.2d 556, 557 (5th Cir. 1971).[4]

 The court rejects defendants' contention that plaintiffs are estopped from attacking their conduct because plaintiffs somehow authorized it when they permitted their insurer to dispose of the salvaged tobacco. They argue that because the insurance policy lacked label protection coverage, the insurer was not obligated to remove plaintiffs' labels prior to any sale. They then argue that since it is customary not to label salvaged goods as such, plaintiffs, by permitting the insurer to sell the goods without imposing any conditions, authorized sales of the salvaged tobacco without notice to the consuming public.

Defendants further argue that when the insurer sold the tobacco for the account of Dunhill, Inc., it was acting as Dunhill, Inc.'s agent. Therefore, it was Dunhill, Inc., which sold the salvaged goods to defendant Interstate. Thus, Dunhill, Inc., cannot challenge the sale of goods which it placed into commerce without imposing explicit conditions upon the purchaser.

 The court rejects these claims. While there was uncontradicted testimony by Whalen and Sidney Spielfogel, president of Interstate, that it is not customary to label salvaged goods as such, the court has found that some of the tobacco products were damaged and that this fact was not ascertainable except after the cans had been opened. Given several F.T.C. decisions indicating that such sales of damaged goods without warning are unfair trade practices, the court finds that it was reasonable for plaintiff, Dunhill, Inc., when it permitted the insurer to dispose of the tobacco, to assume that retailers and the consuming public would be appropriately warned. While it would have been better practice for plaintiff, Dunhill, Inc., to have made its expectations more explicit before it authorized the insurer to dispose of the tobacco, its conduct was not unreasonable in the light of such cases and the court cannot find that it authorized the conduct it now challenges.

 The court also rejects defendants' claim that the insurer was acting as Dunhill, Inc.'s agent when it sold the tobacco. The testimony showed that Dunhill, Inc., had no control over the terms of the salvage sale. Therefore, an essential earmark of an agency relationship, that the principal have the right to control the physical conduct of its agent, was missing. *See* Restatement, Agency 2d § 2.[5]

 Nor are plaintiffs barred by laches from attacking defendants' conduct. While plaintiffs did not file their complaint until September 12, 1973, almost three months after Harris, president of Dunhill, Inc., learned that Interstate had purchased the salvaged tobacco, the delay was not unreasonable. While Hartunian, the treasurer of Dunhill, Inc., testified that he assumed that Interstate would sell the tobacco as soon as he learned of Interstate's purchase, Dunhill, Inc., subsequently sent letters to Interstate urging that the tobacco not be sold in the original containers or in con-

---

4. The reach of Section 1125(a) has not yet been determined by the Second Circuit. *See* Bose Corporation v. Linear Design Labs, Inc., 467 F.2d 304 (2d Cir., 1972).

5. Defendants also argue that plaintiffs are estopped because the sale was warranted to be free of any claims for infringement. They cite the Uniform Commercial Code, § 2–312(3), McKinney's Consol.Laws, c. 38, in effect in New York, which provides in part:

> . . . Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like . . . ..

Since the defendants purchased the salvaged goods from United Salvage, at most this section might support a claim against the salvage company. The section cannot be read to provide that Dunhill, Inc., when it authorized its insurer to dispose of the goods, somehow warranted to Interstate, a subsequent purchaser, that the goods were free of any claims of infringement.

nection with the Dunhill trademarks. It was reasonable for plaintiffs not to file suit until they determined whether Interstate intended to comply with their request. However, Interstate did not answer plaintiffs' letters and, as found above, there is no evidence that plaintiffs knew that the tins were being sold to retailers and consumers in violation of the Lanham Act until September, 1972.

Moreover, there is no showing that any delay in filing suit has been prejudicial to defendants. Defendant Interstate purchased the tobacco on June 18, 1972 and defendants M. Shapiro Sons and Seckler Bros. purchased the tobacco from Interstate on July 21, 1972 and July 11, 1972 respectively. Once defendants had purchased the tobacco and there being no showing that they invested significantly in the marketing of the tobacco products, they were not prejudiced by any delay.

Finally, Rule 8(d), Fed.R.Civ.P. requires that laches be pleaded as an affirmative defense. This defendants failed to do.[6]

The court further finds that continued sales of the salvaged tobacco without appropriate warnings to the public that the tobacco may be damaged will do irreparable harm to plaintiffs' reputation for high quality tobacco products.

Because of the court's disposition of plaintiffs' federal claim, the court does not believe it necessary to decide what appear to be difficult issues of first impression with respect to plaintiffs' pendent state claim.

Defendants Interstate, M. Shapiro Sons Smoke Shop, Inc., and Seckler Bros., Inc., accordingly will be permanently enjoined from selling tobacco from the 168 cartons of tobacco which

were subjected to water damage without taking effective steps to warn their customers that the tobacco has been subjected to possible water damage.

Submit order on five days' notice.

---

6. The court also rejects defendants' claim that this suit was commenced in bad faith since it was the purpose of Dunhill, Inc., to restrain price cutting. While Hartunian, the treasurer of Dunhill, Inc., testified that he at first opposed permitting the insurer to dispose of the salvaged tobacco because "We didn't want it sold at discount prices," the court finds that plaintiff's primary purpose was to protect its reputation for high quality tobacco products.