**ALFRED DUNHILL LIMITED and Alfred Dunhill of London, Inc.,**
**Appellees,**

v.

**INTERSTATE CIGAR COMPANY, INC., et al., Appellants.**

**Nos. 346, 347, Dockets 73–1177, 73–1402.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 15, 1974.

Decided June 27, 1974.

Noel W. Hauser, Brooklyn, N. Y. (Hauser & Rosenbaum, Brooklyn, N. Y., of counsel), for appellants Interstate Cigar Co., Inc., Jamaica Tobacco & Sales Corp., M. Shapiro Sons Smoke Shop, Inc. and Seckler Bros., Inc.

Victor S. Friedman, New York City (Fried, Frank, Harris, Shriver & Jacobson and Steven Kimelman, New York City, of counsel), for appellees Alfred Dunhill Limited and Alfred Dunhill of London, Inc.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

This is an appeal by defendants from an order of the United States District Court for the Southern District of New York, granting a permanent injunction prohibiting appellees from selling salvaged Dunhill brand tobacco without informing prospective purchasers of its origin and possible damaged condition and, in implementation thereof, further directing the appellees to permit Alfred Dunhill Limited and Alfred Dunhill of London, Inc. to label each tin of salvaged Dunhill tobacco in appellees' possession with the legend: "Subjected to Possible Water Damage."

Because we believe that plaintiffs have failed to state a claim upon which relief can be granted, we reverse and remand the decision of the District Court with instructions to vacate the injunction and dismiss the complaint.

Alfred Dunhill of London, Inc. (hereinafter "Dunhill") is the exclusive distributor in the United States of the tobacco and tobacco products manufactured by Alfred Dunhill Limited, a British corporation.

In February 1972 a large container filled with two hundred and sixty-eight fiberboard cases of Dunhill brand tobacco arrived, after a transAtlantic voyage, at Dunhill's New York warehouse in a damaged condition. Apparently, prior to delivery in New York, a hole had de-

veloped in the roof of the container in which the cases of tobacco had been packed and an undetermined amount of water had entered. Upon inspecting the merchandise, Dunhill set aside one hundred and sixty-eight cases of tobacco which it considered likely to have been damaged by exposure to water. It retained the remaining one hundred cases and marketed their contents in the regular course of business.

After receiving the shipment, Dunhill made a claim on its insurance carrier, William McGee & Company and Sun Insurance Company, for the water loss. Dunhill's insurance agreement with McGee provided:

Partial loss: In case of partial loss or damage caused by a peril insured against, the proportion of loss shall be determined by a separation of the damaged portion of the insured property from the sound and by agreed estimate (by survey) of the percentage of damage of such portion; or if such agreement is not practicable, then by public sale of such damaged portion for the account of the owner of the property and by comparison of the amount so realized with the sound market value on the day of sale.

Worman & Company, Inc., William McGee & Company and Sun Insurance Company's surveyor, examined the cases of allegedly damaged goods and, on behalf of the insurer, offered Dunhill twenty-five percent of the insured value of the one hundred and sixty-eight cases. Under the terms of its insurance contract, Dunhill was faced with the choice of either keeping the tobacco and settling for the immediate recovery of a fraction of its value or permitting the insurer to sell for its account the tobacco as salvage and collecting full face value. Dunhill agreed to the salvage sale and the goods were shipped to United Salvage Company (United) for disposition.

In June 1972, appellant Interstate Cigar Company, Inc., a wholesale merchant, purchased the tobacco from United. At the time of the purchase, Interstate was fully aware that the tobacco was salvaged goods and had been subjected to possible water damage. The bill of sale read "Dunhill Tobacco—As Is—Salvage," and the price paid was $8,000. No conditions were imposed upon resale of the tobacco.

On or about July 12, 1972, Dunhill received from Worman & Co. United's check to the order of Dunhill, Inc., in the amount of $7,559.18, representing the proceeds of the sale less United's commission. On or about August 23, 1972, Dunhill received a second check from William McGee & Company in the amount of $13,850.33 which apparently constituted the remainder of the invoice value and other costs of the damaged tobacco and non-tobacco merchandise and the amount received by Dunhill from United Salvage.

After the sale had been consummated and Interstate had received the goods, Walter Harris, Jr., president of Dunhill, and Sidney Spielfogel, president of Interstate, conversed over the telephone. Harris demanded that Interstate mark the cans as salvage or stop selling the tobacco. Spielfogel rejected this demand but offered to rescind the transaction and return the tobacco to Dunhill. Harris replied that he didn't want the tobacco back. On June 23, 1972 and on August 9, Dunhill sent letters to Interstate and Interstate's attorney, respectively, demanding that the tobacco be relabeled. No reply was made to either letter.

From June 1972 to September 1972, Interstate sold quantities of this Dunhill tobacco to defendants Seckler Bros., Inc. and M. Shapiro Sons Smoke Shop, Inc. and to nine other retailers. One of these retailers was Arnold's Cigar Store in Miami Beach, Florida. In spite of the fact that on June 21, 1972, Interstate circulated a memorandum among its sales personnel advising them that customers should be warned that the merchandise was salvage, there is proof to the effect (and the District Court found) that on at least one occasion Interstate sold a quantity of the tobacco in question without advising its customer

that the goods had been subject to possible water damage. Morever, several retailers, while they placed the tobacco on sale at unusually low prices, did not give their retail customers specific notice that the tobacco was salvaged merchandise and had been subjected to possible water damage.[1]

On September 12, 1972, appellants filed their complaint in the United States District Court for the Southern District of New York, together with affidavits in support of an application for a temporary injunction and a Temporary Restraining Order, asking that Interstate be forbidden from selling the salvaged Dunhill tobacco under the Dunhill trademark. A Temporary Restraining Order was granted on September 12, 1972. On October 12, 13 and 17, the District Court held a consolidated hearing on applications for a temporary injunction and a permanent injunction. The Temporary Restraining Order continued in effect until February 7, 1973, when the District Court issued its memorandum opinion.[2]

The District Court held that defendants should be permanently enjoined from selling the tobacco "without taking effective steps to warn their customers that the tobacco had been subjected to possible water damage." On February 23, 1973, the District Court issued an Order of Permanent Injunction prohibiting all defendants from selling the salvaged tobacco without informing prospective purchasers of its actual origin and possible damaged condition. Furthermore, the Court directed defendants

to permit plaintiffs to label each tin of tobacco remaining in defendants' possession with the legend: "Subjected to Possible Water Damage."

Dunhill successfully argued to the court below that Interstate violated Section 43(a) of the Lanham Trade-Mark Act of 1946[3] when it resold the Dunhill brand tobacco without removing the Dunhill labels or without affixing a warning to each of the cans cautioning potential customers that the tobacco had been subjected to possible water damage. Section 43(a) of the Lanham Act provides that:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a)(1970).

Although Dunhill concedes that Interstate never affixed to Dunhill containers false descriptions or representations or even used such descriptions or representations in connection with the sale of Dunhill tobacco products, it nevertheless asserts that the broad command of the Lanham Act was violated and a false im-

1. The tobacco was retailed in two ounce and four ounce vacuum sealed tins. There were anywhere from eight to sixteen such tins enclosed in light cardboard cartons. Twenty such cartons were packed in each of the one hundred and sixty-eight cases purchased by Interstate.

It is impossible to determine whether the contents of a particular tin are damaged unless that tin is opened by breaking the airtight rubber seal, an event which causes the tobacco to deteriorate. Nevertheless, there was a high incidence of rusted tins among those purchased by Interstate and that indicates that the tins had been exposed to wa-

ter. In spite of the fact that the tins are air-tight, it is possible for water to seep underneath the lid and destroy the rubber seal after which the tobacco immediately begins to deteriorate.

2. On February 2, 1973, almost four months after the consolidated hearing, defendants moved in the United States Court of Appeals to vacate the District Court's Temporary Restraining Order. This motion was denied on February 13, 1973.

3. 60 Stat. 427, 15 U.S.C. §§ 1051–1127 (1970).

pression was given consumers who purchased salvaged Dunhill tobacco, generally a high quality product, without being warned of the tobacco's unusual history. The District Court agreed, finding that:

> [D]efendants have falsely represented the quality of the salvaged tobacco in violation of Section 1125(a). Sales of damaged tobacco in tins bearing trademarks associated with high quality tobacco, without adequate warnings to customers that the goods are damaged, involve false representations of their quality. False representations can be the product of affirmatively misleading statements, of partially correct statements or failure to disclose material facts. The public can be as easily misled by the purchase of damaged goods in their original containers which the purchasers do not know are damaged as they can be by statements that the goods are not damaged.

Alfred Dunhill Limited v. Interstate Cigar Co., 364 F.Supp. 366, 372 (S.D.N.Y. 1973).

▪ Section 43(a) of the Lanham Act was intended to expand the rights of those who were harmed by unfair competition. It was meant both to enlarge the category by activities which are proscribed by federal law and to expand the class of plaintiffs who could assert standing to sue under federal law.[4] The scope of this piece of legislation was reviewed by Judge Hastie in L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d 649 (3d Cir. 1954), where he wrote that, in addition to prohibiting "palming off" as judge-made law as had always been done, § 43(a) provided a federal remedy for the tort of "false advertising to the detriment of a competitor" as set forth in the Restatement of Torts.[5] 214 F.2d at 651.

In the twenty years that have elapsed since the L'Aiglon decision, the courts have been careful to retain the integrity of Section 43(a) as it was written. Although the Lanham Trade-Mark Act of 1946 was intended to expand the class of plaintiffs who could claim relief under federal law, it was not meant to provide standing to everyone who wished to seek relief thereunder. In Colligan v. Activities Club of New York, 442 F.2d 686 (2d Cir.), cert. denied, 404 U.S. 1004, 92 S. Ct. 559, 30 L.Ed.2d 557 (1971), after fully considering the history of the legislation and the objectives to be accomplished thereby, this court held with respect to Section 43(a) that:

> We conclude, therefore, that Congress' purpose in enacting § 43(a) was to create a special and limited unfair competition remedy, virtually without regard for the interests of consumers generally [26] and almost certainly without any consideration of consumer rights of action in particular. The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct. (footnote omitted).

442 F.2d at 692.

▪ Similarly, although the Act was intended to enlarge the category of activities proscribed by federal law in 1946 and to be "broadly construed,"

---

4. This section [43(a)] is a marked enlargement of the corresponding provisions of the Trade-Mark Act of 1920. The older section dealt only with "a false designation of origin" affixed to "an article of merchandise"; it applied only against persons who used such designations "willfully and with intent to deceive"; and it gave an action only to persons "doing business in the locality falsely indicated as that of origin" or associations of such persons.

Bunn, The National Law of Unfair Competition, 62 Harv.L.Rev. 987, 998 (1947).

5. One who diverts trade from a competitor by fraudulently representing that the goods which he markets have ingredients or qualities which in fact they do not have but which the goods of the competitor do have, is liable to the competitor for the harm so caused, if,

(a) when making the representation he intends that it should, or knows or should know that it is likely to, divert trade from the competitor, . . . .

Restatement of Torts § 761 (1934).

within that context, *see* Geisel v. Poynter Products, Inc., 283 F.Supp. 261 (S. D.N.Y.1968), the courts have been careful to recognize that § 43(a) does not have boundless application as a remedy for unfair trade practices but is limited to false advertising as that term is generally understood. *See* 1 Callman, Unfair Competition, Trademarks & Monopolies § 18.2(b).

The decision of the District Court, which held that the Lanham Act requires a seller to distinguish the product he sells, cannot be reached through an interpretation of the statutory language or legislative or judicial history of the Lanham Act. The court reached its result by reading the Lanham Act in conjunction with "unfair and deceptive trade practice" provisions of the Federal Trade Commission Act,—The Court wrote:

> [W]hen consumers are deceived by misleading statements and a competitor engaged in commerce can show that it has been damaged by those misrepresentations, it has standing to challenge those practices under the Lanham Act. And it seems clear that the opinions of the Federal Trade Commission, an expert agency charged by Congress with the responsibility of protecting consumers and competitors from unfair trade practices, are relevant where the claim is that deceptions of the public have harmed a person engaged in commerce.

*Alfred Dunhill Limited,* 364 F.Supp. at 372.

Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), prohibits unfair methods of competition in commerce. The Federal Trade Commission, in the exercise of its power, has interpreted this provision to mean that it may require those who purvey goods to make affirmative disclosures about those goods where necessary to prevent the deception of the purchaser. *See, e. g.,* In the Matter of Scott-Mitchell House, Inc., 56 FTC 1488 (1959); In the Matter of B&C Distributors Co., 55 FTC 866 (1958); In the Matter of Stanley Electronics Corp., 55 FTC 303 (1958). The courts have agreed with the Commission's interpretation of the Commission's power under the Federal Trade Act and have typically held that:

> [F]ailure to disclose or mark or label material facts concerning merchandise, which, if known to prospective purchasers, would influence their decisions of whether or not to purchase, is an unfair trade practice violative of § 5 of the Federal Trade Commission Act, Haskelite Manufacturing Corp. v. Federal Trade Commission, 7 Cir., 127 F.2d 765, . . .

L. Heller & Son v. Federal Trade Commission, 191 F.2d 954, 956 (7th Cir. 1951). *See also* Ward Laboratories, Inc. v. Federal Trade Commission, 276 F.2d 952 (2d Cir. 1960).

Nevertheless, just as the Lanham Act clearly defines the category of those who may claim standing under its terms, the provisions of the Federal Trade Commission Act may be enforced only by the Federal Trade Commission. Nowhere does the Act bestow upon either competitors or consumers standing to enforce its provisions. Moore v. New York Cotton Exchange, 270 U.S. 593, 603, 46 S.Ct. 367, 70 L.Ed. 750 (1925); Holloway v. Bristol Myers Corp., 485 F.2d 986 (D.C.Cir.1973).

The Federal Trade Commission Act does not give *competitors* the right to sue for unfair advertising and the Lanham Act does not give anyone the right to sue for acts which constitute deceptive trade practices but which do not constitute unfair advertising. Even if this court were to accept the judgment of the District Court that Interstate has engaged in an unfair trade practice by not relabeling the tobacco tins, neither the Federal Trade Commission Act nor the Lanham Act provides relief for Dunhill under the circumstances. .

Not every possible evil has yet been proscribed by federal law. The fact that there are some acts which may ar-

guably be wrongful and which are not prohibited by existing statutes does not license courts to disregard the boundaries which Congress has written into its legislation.

Were we for a moment to ignore the barriers which stand in the way of the District Court's merger of the Federal Trade Commission Act and the Lanham Act, Dunhill would still present a very poor claim as victim of an unfair or deceptive trade practice. This is not a case, as in J. C. Penney Co. v. Parrish Co., 335 F.Supp. 209 (D.Idaho 1971), where the defendant acquired plaintiff's rejected merchandise from unknown third parties, see Finding No. 17, J. C. Penney Co. v. Parrish Co., *supra,* at 210, and then affirmatively touted it as first quality. *See* In the Matter of Stanley Electronics Corp., *supra.* Rather, Interstate acquired the tobacco from Dunhill, its insurer or agents, which had voluntarily relinquished title to the goods without attaching any conditions to their resale, and sold the tobacco at cut rates without making any affirmative claims to the effect that these were first quality goods.

If Dunhill had wished to distinguish the salvaged tobacco from that sold through its normal channels of distribution, it should have done so while the allegedly damaged tobacco was still under its control and before it was released into the salvage markets. From the beginning Dunhill was in the best position to effect the relabeling. It would be unfair, under the circumstances, for one party in the chain of distribution to impose upon another further down the line an obligation to decrease the value of the goods.

■ The District Court found that Dunhill had not waived its right to complain by failing to apprise Interstate of any resale conditions prior to Interstate's purchase because it found that Dunhill was powerless to relabel the tobacco and "had no control over the terms of the sale of the tobacco by United Salvage." 364 F.Supp. at 369. That finding all but ignores the facts that underlie this case. It is true that Dunhill relinquished possession of the goods to the representative of its insurance carrier and thereafter could not have relabeled the tins of tobacco. If it had done so, the insurance carrier would have been forced to suffer the loss occasioned by the branding of the goods. Dunhill knew full well that it could not insist that William McGee & Company and Sun Insurance Company take such a loss because it had refused to pay the extra insurance premium for "label and brand protection coverage" which would have permitted it, prior to the salvage sale, to remove its own labels from the tobacco. Nevertheless, to say that Dunhill was powerless to relabel the tobacco ignores the fact that Dunhill made a free choice not to relabel when it agreed to the terms of its insurance coverage.

Because we find that neither the Federal Trade Commission Act nor the Lanham Act provides relief under the circumstances of this case and because we find that, even if they did, plaintiffs have waived their right to sue for an injunction, we reverse the decision of the District Court and remand with instructions to dissolve the permanent injunction and to dismiss the complaint for failure to state a claim upon which relief can be granted. Since we have found that the complaint fails to state a federal claim and since the District Court has not yet reached the pendent state claims alleged in this case, we direct it to dismiss those state claims for want of jurisdiction.

With respect to appellants' request that this court should direct the District Court "to proceed with an assessment of damages sustained by the defendants as a result of the granting of injunctive relief, as well as with their counterclaims" (Applts' Br. at 35), this matter is not before us and appellants are relegated to whatever relief, if any, may be available under any bond, or otherwise, in an appropriate forum.

ROBERT P. ANDERSON, Circuit Judge (concurring in the result):

I concur in the result.

Had the rejected and damaged tins been acquired by the seller from an independent third-party, it seems to me that Dunhill would be entitled to seek relief under the Lanham Act against such a vendor for selling a tin of tobacco with Dunhill's label on it under circumstances in which it would be reasonable for the purchaser to assume that he was getting Dunhill's standard quality tobacco.