373 So.2d 571 (1979)
James F. GOUR, Plaintiff-Appellee,
v.
DARAY MOTOR CO., INC. and General Motors, Inc., Defendants-Appellants.
No. 6893.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1979.
Rehearings Denied August 15, 1979.
*573 Thomas & Dunahoe, G. F. Thomas, Jr., Natchitoches, for defendants-appellants.
Hudson, Potts & Bernstein, Jesse D. McDonald, Monroe, for defendants-appellees.
Frank S. Normann, New Orleans, for plaintiff-appellee.
Before CULPEPPER, FORET and DOUCET, JJ.
DOUCET, Judge.
This is an action for the annulment of a sale of an automobile and for damages. Plaintiff is the purchaser of the automobile; defendants are its manufacturer and the dealership through which it was sold. Both defendants have appealed from a judgment of the trial court, annulling the sale and awarding attorney's fees to plaintiff. For reasons which will follow, we affirm.
On February 17, 1977, plaintiff, James F. Gour, purchased a 1977 Oldsmobile Delta 88 Royale from Daray Motor Co., Inc. (hereinafter referred to as "Daray"). The total price of the sale was $8,122.65, which plaintiff satisfied by trading in a 1974 Oldsmobile and paying the balance in cash. The car had been manufactured primarily by the Oldsmobile Division of General Motors Corporation (hereinafter referred to as "General Motors"), however, the engine had been manufactured by General Motors' Chevrolet Division. The engine, designated by General Motors as an LM1 engine, had been substituted for the similar L34 engine, manufactured by Oldsmobile. The present controversy is the result of that substitution.
Plaintiff describes himself as an "Oldsmobile man", having a fondness for and familiarity with that particular make, which has developed over a period of twenty years. During that time, he has owned six other Oldsmobiles, similar to the one he purchased from Daray. Mr. Gour is employed as a district manager for an insurance company, which requires him to drive extensively. He has come to depend on and trust Oldsmobiles to meet his driving needs. He alleges that he was unaware of the substitution of engines at the time he bought the car and that he would not have done so, had he known.
In support of that allegation, plaintiff established that there was nothing on the car or in the documents that he viewed at the time of the sale that indicated to him the true source of the car's engine. The sales invoice contained only the notation, "Engine, 350 V-8 4BBL." Although the window sticker bore General Motors' code name, LM1, its meaning was unknown to plaintiff. Furthermore, the engine's air cleaner bore an eye-catching, red and black on silver decal, which read, "Oldsmobile 350".
Defendants challenge that denial of knowledge. Mr. Tom Elkins, a salesman for Daray, testified at the trial that he recalled saying to plaintiff, as he showed him the car, "Mr. Gour, we have a 350 4-barrel engine in here, a Chevrolet engine". However, he further testified that at the time that comment was made, plaintiff *574 was busily checking the various options on the car. Mr. Gour denied having heard such a statement by Mr. Elkins. The trial court apparently found that although the statement was actually made, Mr. Gour either did not hear it or did not grasp the import of what was said. It concluded that the knowledge of the source of the engine had not been effectively communicated to plaintiff.
The trial court held that the sale was invalid, because plaintiff's consent had been produced by error, the error being his belief that the engine had been manufactured by Oldsmobile. Although plaintiff sought damages for inconvenience caused by the allegedly poor performance of the car and for mental distress, the trial court found that he was not entitled to such damages. However, it ordered that the entire purchase price be returned to plaintiff, upon his surrendering possession and title of the car, without allowing a credit for plaintiff's use of it. It also awarded plaintiff $2,000 in attorney's fees. Both Daray and General Motors were declared bound in solido under the judgment. The court concluded that although the two were separate legal entities, General Motors retained substantial control over Daray's actions in selling the automobiles it manufactured, and its responsibility was, therefore, parallel to Daray's.
The issues before this court are, essentially, whether or not the trial court was correct in (1) holding that the sale was invalid, (2) finding General Motors liable in solido with Daray, (3) awarding plaintiff attorney's fees, and (4) refusing to allow defendants a credit for plaintiff's use of the car.

1.
As with any other type of contract, it is essential to a contract of sale that the consent of the parties be legally given.[1] Under the proper circumstances, the consent of the parties may be vitiated by error.[2] The error complained of by plaintiff in this case is an error of fact, relating to a quality of the object of the contract, other than the principal one.[3] Therefore, the quality of the object sought by plaintiff, an engine manufactured by Oldsmobile, must have been a principal cause for his having entered into the contract. This principal cause, or motive, must have been communicated to the other party, unless it can be presumed from *575 the circumstances that the other party knew of it.[4]
Defendants argue, initially, that there was no error, plaintiff having been informed by Mr. Elkins of the origin of the engine. As we noted earlier, the trial court found as a fact that that information had not been effectively communicated. Given the court's reasonable evaluation of the credibility of the witnesses, we believe that the evidence as a whole supports its conclusion. Since we cannot say that the trial court was manifestly erroneous, that finding will not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The question that remains to be answered is a two-fold one. First, would plaintiff have purchased the car, if he had known that it contained an engine that had not been manufactured by Oldsmobile? Second, can it be presumed that the seller knew of that fact? We believe that the first question must be answered in the negative and the second in the affirmative.
In view of the fact that plaintiff shopped for and purchased an Oldsmobile, rather than a Chevrolet or any other make, we find his claim that he desired an engine produced by Oldsmobile entirely reasonable. The engine, while perhaps not the single most important part of a car, is certainly one of its most major components. Equally reasonable is plaintiff's argument that the seller should be presumed to have known of his preference. The facts of this case are similar to those encountered by the court in Ouachita Air Conditioning, Inc. v. Pierce, 270 So.2d 595 (La.App. 2nd Cir. 1972). In that case, defendant had contracted with plaintiff to repair the York air conditioning system in his home. With defendant's consent, plaintiff replaced two compressors, major components of the system. However, unknown to defendant, plaintiff installed compressors produced by Amana, rather than York. The court concluded:
"We are convinced that this case falls squarely under LSA-Civil Code Article 1845, in that there was error of fact as to the manufacturer of the unit, and that this quality was a principal cause of making the contract from defendant's standpoint. While the seller did not have actual knowledge that this was a principal cause or motive it should be presumed that he knew it from the nature of the transaction and, therefore, the test of Article 1826 is met. Although Lawler was in good faith, when he was confronted with a complete York system in which a major component needed replacing he should have been aware that without anything being said to the contrary, the buyer would expect replacement with the same brand of unit. The trial court was correct in setting aside the sale and rejecting plaintiff's demands."
General Motors would distinguish this case essentially on the basis of the fact that the manufacturer of the unit did not approve the specifications for or warrant the replacement parts. However, while it is reasonable to assume that the warranties and quality approval of the manufacturer play a part in the purchaser's choice of a product, it would be unwarranted to assume that it is the only consideration, or even that it is necessarily the primary one.
We believe that it can and should be presumed from the circumstances of this case that the seller knew that plaintiff's desire to obtain an Oldsmobile with an Oldsmobile engine was the principal cause for his entering into the contract of sale. We further believe that our conclusion is supported by the actions taken by both defendants in effecting their common purpose of selling cars. General Motors carefully concealed the source of the engine from the *576 buying public by identifying it only with a code, which an unaided purchaser could not understand. Daray's salesman was aware of the meaning of that code and of the fact that the car contained a Chevrolet engine. However, while he apparently considered it a fact worthy of mention, only a passing comment was made, and it was made at a time when the buyer was obviously distracted.
Although the above adequately resolves the issue of the recission of the sale, we prefer to base our decision to affirm on another provision of our law, which is more directly aimed at redressing the kind of consumer complaint made by plaintiff, and which provides for more comprehensive relief. We are referring to LSA-R.S. 51:1401, et seq., the Unfair Trade Practices and Consumer Protection Law.[5]
In broad language, LSA-R.S. 51:1405(A) declares that:
"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
The terms "trade" and "commerce" are defined by § 1402(10) as:
"[T]he advertising, offering for sale, sale or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of this state."
It is apparent from these provisions that the business activities of General Motors and Daray are within the purview of this act, and that they are subject to the sanctions provided for therein, for any of those activities found to be in violation of the act. We believe that there has been such a violation in this case.
General Motors, on the other hand, argues that its actions, which plaintiff complains of, are exempt from the provisions of the Unfair Trade Practices and Consumer Protection Law, relying on LSA-R.S. 51:1406, which provides in part:
"The provisions of this chapter shall not apply to:
(4) Any conduct which complies with section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C., 45(a)(1)], as from time to time amended, any rule or regulation promulgated thereunder and any finally adjudicated court decision interpreting the provisions of said Act, rules and regulations."
It argues that its conduct complies with and is sanctioned by the Federal Trade Commission Act, citing In The Matter of General Motors Corp., 53 F.T.C. 1239 (1957).
The latter action was initiated by the Federal Trade Commission, which charged General Motors with committing a fraudulent and deceptive trade practice. The activity complained of was General Motors' advertising automobile replacement parts as "Genuine Chevrolet Parts", when they were manufactured by outside vendors, rather than by any division of General Motors. That advertising was alleged to be false and deceptive. After a hearing on the matter, the F.T.C. dismissed the complaint, holding that the parts were as much genuine parts as those made in General Motors' own plant, because they were made according to its specifications and tested, approved and warranted by it.
We see a great deal of difference between replacement parts, used for maintenance purposes, and a major component part of a new car, such as the engine. Our view is apparently shared by the F.T.C., which has brought another complaint *577 against General Motors, based in part on its substitution of engines in the manner complained of in the present case. See In The Matter of General Motors Corp., F.T.C., No. 772-3031, decided June 21, 1978. In response to that complaint, General Motors has entered into an agreement containing a consent order to cease and desist, among other things, misrepresenting the manufacturing source of any engine option. Under the order, General Motors is specifically prohibited from displaying the name of a particular General Motors division on the air filter cover of the engine, unless the engine was manufactured by that division. While the latter agreement provides that it is not an admission by General Motors that the law has been violated, we believe that the complaint, together with the agreement, casts considerable doubt on General Motors' assertion that its activities are sanctioned by the Federal Trade Commission Act.
That doubt is further reinforced by the opinion of the court in In Re General Motors Corporation Engine Interchange Litigation v. General Motors Corporation, 594 F.2d 1106 (7th Cir. 1979), docket no. 78-2036, decided February 26, 1979. The posture of that case was similar to that in State ex rel. Guste v. General Motors Corporation, 370 So.2d 477 (La.1979), in that the issue was procedural, and the court, therefore, did not rule definitively on the merits of the case. The issue was the propriety of a subclass settlement in a federal class action. The class action was founded on consumer complaints about the substitution of engines as in this case. In considering the fairness of the settlement, the court found it necessary to examine the strength of the plaintiffs' case against General Motors. At footnote 44 of the court's opinion, it stated:
"We think the objectors presented substantial evidence tending to show that GM deliberately concealed the source of the engines in the cars that it sold as Oldsmobiles and that it did so to increase profits."
The court's discussion as a whole strongly suggests to us that the activities in question are in violation of the Federal Trade Commission Act and other federal laws.
That conclusion is not surprising in view of the fact that the federal courts have consistently condemned trade activities calculated to deceive the buying public. For example, see the court's opinion in Alfred Dunhill Ltd. v. Interstate Cigar Co., 499 F.2d 232 (2nd Cir. 1974), in which it said:
"The courts have agreed with the Commission's interpretation of the Commission's power under the Federal Trade Act and have typically held that:
`[F]ailure to disclose or mark or label material facts concerning merchandise, which, if known to prospective purchasers, would influence their decisions of whether or not to purchase, is an unfair trade practice violative of § 5 of the Federal Trade Commission Act, Haskelite Manufacturing Corp. v. Federal Trade Commission, 7 Cir., 127 F.2d 765,. . .'
L. Heller & Son v. Federal Trade Commission, 191 F.2d 954, 956 (7th Cir. 1951). See also Ward Laboratories, Inc. v. Federal Trade Commission, 276 F.2d 952 (2d Cir. 1960)."
We find General Motors' argument that its activities are sanctioned by federal law untenable, when balanced against the weight of these authorities.
In considering the question of what constitutes a violation of LSA-R.S. 51:1405(A), the court in Guste v. Demars, 330 So.2d 123 (La.App. 1st Cir. 1976), said the following:
"The substantive prohibition of the Unfair Trade Practices and Consumer Protection Law is broad and does not specify particular violations. ... The language of this section tracks closely that of the Federal statute, 15 U.S.C. Section 45(a). Because of the variety of possible unfair and deceptive practices, the Federal statute was intentionally broadly written, leaving the determination of individual violations to the Commission and the courts. Our legislature has expressed a similar intention in patterning our law so *578 closely on the Federal statute. Therefore, we may and should consider interpretations of the Federal courts and of the Commission relative to such similar statutes to adjudge the scope and application of our own statute. State, through Dept. of Highways v. Braddock, 170 So.2d 5 (La.App. 1st Cir. 1964)."
We agree that the federal authorities set out above are proper sources for guidance in deciding whether or not there has been an infraction of our law.
We do not base our conclusion that there has been a violation of the Unfair Trade Practices and Consumer Protection Law on a determination that federal law has been transgressed, however. We do not find it necessary to do so, because we believe that the conduct of the defendants in this case is of the kind that our own legislature has declared unlawful. General Motors deliberately took measures, such as putting the decal on the air cleaner, which were calculated to lead plaintiff to believe that he was purchasing a car that contained an Oldsmobile engine. Daray became a party to that misrepresentation when it failed to adequately disclose the true source of the engine, and it profited from the deception, as well. Therefore, we hold that there has been a violation of LSA-R.S. 51:1405(A).
LSA-R.S. 51:1409(A) provides that any person, who suffers a loss of money or movable property as a result of a practice violative of 1405(A) may bring a private action, individually, but not in a representative capacity, to recover "actual damages". Recently, our supreme court in State ex rel. Guste v. General Motors Corporation, supra, upheld a decision of the Fourth Circuit in which the term "actual damages" was interpreted to mean "relief other than the refund of the purchase price and the return of the status quo that constitutes restitution". As noted earlier, that case was concerned with a class action brought by the Attorney General. The court held that such an action is permissible, provided that it is limited to restitutionary recovery, in view of the prohibition contained in § 1409(A).
Justice Marcus points out in his dissenting opinion that the majority's interpretation could lead to the conclusion that § 1409(A) allows a private action for the recovery of other damages, but precludes recovery in restitution. We agree with him that the legislature did not intend such a result. Moreover, we do not believe that such a result must necessarily follow from the position taken by the majority.
It can be argued that because the legislature specifically provided for the recovery of actual damages in a private action, it intended to prohibit all other types of recovery. However, that argument ignores the fact that in enacting § 1409(A), the legislature included a rather strong incentive for injured consumers to invoke private litigation. It provides for the recovery of treble damages, if an unfair or deceptive practice is used after the offending party is put on notice by the director of the Governor's Consumer Protection Division or the Attorney General. It also provides for the recovery of reasonable attorney's fees and costs incurred in bringing a private action. That incentive would be greatly diminished if the plaintiff was prohibited from seeking restitution.
As the majority of our supreme court noted, a class action may be of great utility to injured consumers, even though their individual recovery is limited to restitution. A legislative intent to provide for such an action is understandable. The same cannot be said, however, of a private action in which the plaintiff is prohibited from recovering for what may be the major portion of his loss. We believe that it was the intent of the legislature to allow restitutionary recovery as well as the recovery of other damages under LSA-R.S. 51:1409(A) and that plaintiff in this case is entitled to the return of the purchase price.

2.
General Motors correctly argues that the trial court erred in holding it solidarily liable with Daray on the basis of its supposed control over the actions of Daray.
*579 There is no evidence, whatsoever, in the record to support such a conclusion. However, we have determined that General Motors is guilty of activities which are unfair and deceptive trade practices within the meaning of LSA-R.S. 51:1405(A). Those practices combined with Daray's failure to disclose the origin of the engine to produce the injury of which plaintiff complains. General Motors is, therefore, equally responsible for producing the harm that was done.
Under these circumstances, we can see no difference between the positions of the defendants and those of joint tort-feasors under LSA-Civil Code Article 2315, nor can we see any reason why they should be treated differently. Under our law, joint tort-feasors are solidarily liable. LSA-Civil Code Articles 2103, 2324; Mullin v. Skains, 252 La. 1009, 215 So.2d 643 (1968); Cavalier v. City of New Orleans, 273 So.2d 303 (La. App. 4th Cir. 1973), writ denied, 275 So.2d 781 (La.1973). Therefore, we hold that General Motors is liable in solido with Daray.

3.
Since we have found that defendants have violated the Unfair Trade Practices and Consumer Protection Law, we find it unnecessary to discuss the numerous arguments raised by defendants on the issue of attorney's fees. LSA-R.S. 51:1409(A) provides that reasonable attorney's fees shall be awarded in the event that damages are awarded under that section. In view of the complex nature of this litigation and the amount of time spent by plaintiff's attorney in court, the award of $2,000 is certainly not unreasonably high.
Plaintiff's attorney has asked by way of a reply brief filed on February 16, 1979 that the award for attorney's fees be increased to $3,500. LSA-C.C.P. Art. 2133 provides that if an appellee desires to have a judgment modified or revised, he must file an answer to the appeal, stating the relief demanded, not later then fifteen days after the return day or the lodging of the record, whichever is later. The later date in this case was the lodging of the record, which occurred on October 11, 1978. Accordingly, even if plaintiff's request could be construed as an answer to the appeal, it obviously was not timely filed. Since this procedural requirement has not been met, we are not at liberty to grant the increase prayed for, despite the obvious merit of that request under the facts.

4.
By the time of the trial, plaintiff had had the possession and use of the 1977 Oldsmobile for fourteen and one-half months. During that time, the car was driven approximately 17,000 miles. Defendants argue that they should be given a credit for that use. It was stipulated that the rental value of the car was $179.00 per month. Thus, the amount sought in credit is $2,595.50.
We agree that defendants must be allowed a credit for plaintiff's use of the car. As this court said in Nugent v. Stanley, 336 So.2d 1058 (La.App. 3rd Cir. 1976),
"When a sale is rescinded the parties are returned as nearly as possible to the situation as it existed prior to the sale. The vendee returns the property to the vendor and the vendor returns the purchase price subject to whatever adjustments are necessary for his use of the property during the period he possessed same. Jones v. Deloach, 317 So.2d 240 (La.App. 2nd Cir. 1975)."
True restitution cannot be achieved in a case such as this without allowing for the buyer's use of the car.
We cannot agree with the method of computing the credit proposed by defendants, however. $179.00 per month represents the amount that a bona fide lessee would have been charged for the use of the car. Presumably a profit would have been made on such a transaction. Under the circumstances of this case, defendants are not entitled to profit from plaintiff's use of the car. Recently, in the case of Robertson v. Jimmy Walker Chrysler-Plymouth, 368 So.2d 747 (La.App. 3rd Cir. 1979), writs denied June 1, 1979, which also involved the *580 dissolution of a sale of an automobile, we held that $.08 per mile was a proper credit to be allowed against the purchase price for the buyer's use of the car. Applying that method of computation to the present case, we have determined that defendants are entitled to a credit of $1,360 for the 17,000 miles that the car had been driven.
For the reasons set forth herein, the judgment of the trial court is amended to allow defendants, Daray Motor Co., Inc. and General Motors Corporation a credit in the amount of $1,360. In all other respects the judgment of the trial court is affirmed. All costs of this appeal are assessed against defendants.
AMENDED AND AFFIRMED.
NOTES
[1] LSA-Civil Code Article 1779

Art. 1779. Four requisites are necessary to the validity of a contract:
1. Parties legally capable of contracting.
2. Their consent legally given.
3. A certain object, which forms the matter of the agreement.
4. A lawful purpose.
[2] LSA-Civil Code Article 1819

Art. 1819. Consent being the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by
Error;
Fraud;
Violence;
Threats.
LSA-Civil Code Article 1823
Art. 1823. Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was the principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself.
[3] LSA-Civil Code Article 1820

Article 1820. Error, as applied to contracts, is of two kinds:
1. Error of fact;
2. Error of law; [.]
LSA-Civil Code Article 1821
Art. 1821. That is called error of fact, which proceeds either from ignorance of that which really exists, or from a mistaken belief in the existence of that which has none.
LSA-Civil Code Article 1844
Art. 1844. The error bears on the substantial quality of the object, when such quality is that which gives it its greatest value. A contract relative to a vase, supposed to be gold, is void, if it be only plated with that metal.
LSA-Civil Code Article 1845
Art. 1845. Error as to the other qualities of the object of the contract, only invalidates it, when those qualities are such as were the principal cause of making the contract.
[4] LSA-Civil Code Article 1825

Art. 1825. The error in cause of a contract to have the effect of invalidating it, must be on the principal cause, when there are several; this principal cause is called the motive, and means that consideration without which the contract would not have been made.
LSA-Civil Code Article 1826
Art. 1826. No error in the motive can invalidate a contract, unless the other party was appraised that it was the principal cause of the agreement, or unless from the nature of the transaction it must be presumed that he knew it.
[5] The history, purpose and general provisions of this act were recently discussed by our Supreme Court in its opinion on rehearing in State ex rel. Guste v. General Motors Corporation, 370 So.2d 477 (La.1979). That case is a class action, brought by the Attorney General in behalf of all plaintiffs aggrieved in the same manner as the plaintiff in this case. It does not preclude us from granting the individual relief sought by plaintiff, however. The court specifically recognized the right of affected consumers, who wished to control their own litigation, to withdraw from the class action. We are of the opinion that Mr. Gour opted out of the class action in this case by filing this separate suit. See Williams v. State, 350 So.2d 131 (La.1977).