FILED
United States Court of Appeals
Tenth Circuit

February 9, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THE INTERMOUNTAIN STROKE
CENTER, INC., a Utah corporation;
NANCY FUTRELL, an individual,

Plaintiffs - Appellants,

v.

INTERMOUNTAIN HEALTH CARE,
INC., a Utah non-profit corporation;
IHC HEALTH SERVICES, INC., a
Utah non-profit corporation;
SELECTHEALTH, INC., a Utah
non-profit corporation,

Defendants - Appellees.

No. 14-4045
(D.C. No. 2:13-CV-00909-DN)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, Chief Judge, and **HOLMES**, and **BACHARACH**, Circuit
Judges.

Plaintiffs-Appellants Dr. Nancy Futrell and the Intermountain Stroke

Center ("Stroke Center") filed suit against Defendants-Appellees Intermountain

Health Care, IHC Health Services, and SelectHealth, bringing various claims

---

[*]     This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Federal Rule of Appellate
Procedure 32.1 and Tenth Circuit Rule 32.1.

under Utah law and the Lanham Act, 15 U.S.C. §§ 1051–1141. The district court dismissed the Lanham Act claim and remanded the non-federal claims to Utah state court. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **affirm**.

## I

### A

Intermountain Health Care is a large network of hospitals, clinics, surgery centers, and physicians. Within its ambit are wholly-owned subsidiaries IHC Health Services, which operates medical facilities throughout the State of Utah, and SelectHealth, a health-maintenance organization. All of these entities (hereinafter collectively "Intermountain") are Utah not-for-profit corporations.

Before closing its doors in 2013, the Stroke Center was a Utah corporation principally conducting business in Salt Lake City. It provided "same-day and next-day treatment" to patients presenting with strokes and transient ischemic attacks ("TIAs").[1] Aplt. App. at 260 (First Am. Compl., filed Oct. 7, 2013). One of its staff members was Dr. Nancy Futrell, a Utah-licensed neurologist who holds herself out as a "speciali[st] in the treatment of stroke." *Id.* at 251. According to Dr. Futrell, the Stroke Center was "the only outpatient, non-emergency facility in

---

[1] Ischemia is a restriction of blood flow (and thus oxygen) to the brain. Any stroke is considered an ischemic attack; a *transient* ischemic attack, or TIA, is simply a stroke of short duration and is "often labeled 'mini-stroke.'" Aplt. Opening Br. at 7. "TIAs are often a warning sign for future strokes." MedlinePlus, *Transient Ischemic Attack*, U.S. Nat'l Library of Med., http://www.nlm.nih.gov/medlineplus/transientischemicattack.html (last updated Jan. 15, 2016).

Utah to provide non-emergency, same-day and next-day stroke and TIA treatment by . . . . a stroke specialist" and the "only" facility in the state that offered these services at rates significantly lower than prevailing hospital rates. *Id.* at 260.

On March 24, 2013, the Stroke Center discontinued operations. Believing that Intermountain's conduct was the impetus for the Stroke Center's cessation of business, Dr. Futrell and the Stroke Center (hereinafter collectively "Plaintiffs") filed a lawsuit against Intermountain in Utah state court on June 4, 2013. Plaintiffs originally alleged violations of Utah's Truth in Advertising Act ("UTIAA") and other state-law claims sounding in tort. After Plaintiffs added a Lanham Act claim to their complaint, Intermountain removed the action to the United States District Court for the District of Utah.

The amended complaint alleges that Intermountain misled prospective consumers regarding the nature and quality of its stroke and TIA services. Plaintiffs' claims focus on certain statements included in Intermountain's advertising and marketing materials: specifically, (1) general representations made "[t]hrough [Intermountain's] marketing efforts" that Intermountain follows "best medical practices," provides the "best possible care," and has a mission of "[p]roviding excellent care of the highest quality at an affordable cost," *id.* at 269–70; and (2) three more specific representations made through Intermountain's (a) website and "Annual Stroke Report," (b) institutional code of ethics ("Ethics Code"), and (c) "Life After a Stroke or TIA" pamphlet ("Stroke Pamphlet"), *id.* at

3

272–80.  According to Plaintiffs, the general statements are literally false, and the specific statements could mislead consumers about the number of Intermountain physicians specializing in stroke and TIA treatment, the efforts made by Intermountain to avoid prohibited sources of revenue, and the proper scope of post-stroke or post-TIA care.

Intermountain moved to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  With respect to the Lanham Act claim—the only claim that the district court ultimately addressed on the merits—Intermountain asserted that all of the statements attributed to it by Plaintiffs were not actionable because they were "mere statements of opinion or scientific disagreement," or because they "[we]re indisputably not 'false.'"  *Id.* at 858 (Mot. to Dismiss, filed Oct. 9, 2013).  Additionally, Intermountain urged the district court to dismiss the Lanham Act claim based on its view that Plaintiffs had failed to allege any competitive injury caused by Intermountain's conduct.

**B**

On March 31, 2014, the district court issued a memorandum decision and order granting Intermountain's motion to dismiss.  The district court's principal conclusion was that Plaintiffs had failed to state a plausible claim for relief under the Lanham Act.  In so ruling, the court observed that "[m]any of [Intermountain's] statements are not assertions of fact for which [Intermountain] may be held liable under the Lanham Act.  With respect to the remaining

4

statements, Plaintiffs have . . . not adequately alleged that the statements are misleading . . . ." *Id.* at 15 (Mem. Decision & Order, filed Mar. 31, 2014).

More specifically, the district court rejected Plaintiffs' contention that Intermountain's general marketing statements—notably, those pertaining to "best medical practices"—could serve as the predicate for a Lanham Act claim. *Id.* It determined that these statements were "not statements of fact" and likened them to "[e]xpressions of sales 'puffery.'" *Id.* at 16. In fact, the court expressly classified these marketing claims as "paradigmatic puffery," *id.* at 20, and stated that its view of them would not change "even if [the statements were] linked to a particular product or service and even if false," *id.* at 18. At bottom, the court was convinced that no reasonable consumer would have relied upon Intermountain's general statements when choosing a stroke or TIA provider.

The court then assessed the three sets of specific statements and deemed them inadequate for purposes of a Lanham Act claim. It found the challenged statements concerning the number of stroke specialists "true and not misleading," *id.* at 21, because Intermountain had truthfully represented how many of its physicians were competent in stroke and TIA treatment and explained that "subspecialists [were] available to assist stroke patients with on-going medical needs," *id.* at 22. Similarly, the court found "true and not misleading" Intermountain's Ethics Code standard pertaining to compliance with federal physician-referral laws. *Id.* at 23. It further determined that Plaintiffs had not

5

"allege[d] a competitive injury associated with th[e] statements" in the Ethics Code. *Id.* at 27. Lastly, the district court concluded that the statements at issue in the Stroke Pamphlet—which very generally explained stroke and post-stroke concerns—were "not misleading as to the nature, characteristics, or qualities of [Intermountain's] services." *Id.* Indeed, the court opined, the Stroke Pamphlet could not reasonably be construed to include "any claims at all about [Intermountain's] stroke or TIA care." *Id.* at 29. The court therefore ruled that Plaintiffs had not stated an actionable Lanham Act claim.

After disposing of Plaintiffs' single federal claim, the district court explained that "[j]urisdiction over Plaintiffs' state law claims [had been] proper only because they [were] appropriately related to Plaintiffs' Lanham Act claim," and that state court was the proper place to litigate Plaintiffs' UTIAA and Utah tort-law claims. *Id.* Accordingly, the court remanded these claims to state court and entered final judgment reflecting a with-prejudice dismissal of Plaintiffs' Lanham Act claim.

Plaintiffs have timely appealed from the district court's dismissal of their Lanham Act claim.[2]

---

[2] On appeal, Plaintiffs do not mount a separate challenge to the district court's decision to remand the remaining state-law claims; therefore, we have no need to discuss the matter further.

6

## II

By way of overview, we affirm the district court's with-prejudice dismissal of Plaintiffs' Lanham Act claim against Intermountain. We rest this affirmance on our determination that the district court correctly decided that Intermountain made no materially false or misleading representations of fact in advertising its stroke and TIA services—a conclusion that ineluctably sounds the death knell for Plaintiffs' Lanham Act claim.

### A

We begin by providing an overview of the relevant legal terrain—i.e., the basic principles governing Rule 12(b)(6) motions, as well as the specific principles pertaining to the Lanham Act.

#### 1

##### a

Our standard of review in the Rule 12(b)(6) context is familiar: "[w]e review de novo a district court's dismissal of a complaint . . . , applying the same legal standard as the district court." *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011); *accord Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir. 2012); *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). "We accept as true 'all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.'" *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quoting *Kerber*,

7

647 F.3d at 959); *accord Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). To withstand dismissal at this stage in the litigation, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Donner v. Nicklaus*, 778 F.3d 857, 864 (10th Cir. 2015).

As the Supreme Court has explained, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Al-Owhali v. Holder*, 687 F.3d 1236, 1239–40 (10th Cir. 2012). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *accord Wood v. Moss*, --- U.S. ----, 134 S. Ct. 2056, 2065 n.5 (2014). Ultimately, in order to satisfy this facial-plausibility standard, "a complaint 'requires more than labels and conclusions' because a 'formulaic recitation of the elements of a cause of action will not do.'" *McDonald v. Wise*, 769 F.3d 1202, 1219 (10th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

**b**

Before proceeding to discuss the substantive standards of the Lanham Act, we address Plaintiffs' argument that the district court committed error by "alter[ing] the federal pleading standard by making it more stringent for plaintiffs." Aplt. Opening Br. at 34. Plaintiffs contend in conclusory fashion that

8

"the District Court acted as a 'savvy judge that actual proof of those facts is improbable.'" *Id.* at 37.  This language emanates from the Supreme Court's *Twombly* decision.  *See Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[] . . . .").

Considering Plaintiffs' allusion to *Twombly*, we understand their position to be that the district court erred by dismissing their action on the ground that they failed to demonstrate that their claims were "likely to be true."  Aplt. Opening Br. at 37 (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).  Because we have held that "'plausible' cannot mean 'likely to be true,'" *Robbins*, 519 F.3d at 1247, if the district court had in fact resolved Plaintiffs' claims under a likely-to-be-true standard, then it would have legally erred.  However, that cannot be said of the court's reasoning.

We find it beyond peradventure that the district court carefully and properly assessed the sufficiency of the complaint under the well-settled facial-plausibility standard.  The court did not err by saying that "[i]f the factual allegations of the complaint are accepted as true, it must be plausible, not merely possible, that the plaintiff is entitled to the relief requested."  Aplt. App. at 15.  Indeed, the Supreme Court has clearly signaled to lower courts that they should draw a "line between possibility and plausibility" in assessing the legal sufficiency of complaints.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

9

557).  In this regard, *Iqbal* instructs that "[t]he plausibility standard is not akin to a 'probability requirement,' but it *asks for more than a sheer possibility* that a defendant has acted unlawfully."  556 U.S. at 678 (emphasis added).  And *Iqbal* further explicates that a complaint cannot pass muster under Rule 12(b)(6) if it does not allow the district court "to infer more than the mere possibility of misconduct."  *Id.* at 679.  We have remained faithful to this articulation of the proper motion-to-dismiss standard, *see Thomas v. Kaven*, 765 F.3d 1183, 1190–91 (10th Cir. 2014) (looking for "more than a sheer possibility that a defendant has acted unlawfully" (quoting *Iqbal*, 556 U.S. at 678)); *accord Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011), and we are confident that the district court properly heeded that well-settled and binding standard here.

## 2

"The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling."  *POM Wonderful LLC v. Coca-Cola Co.*, --- U.S. ----, 134 S. Ct. 2228, 2234 (2014); *see World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006) ("[U]nder the Lanham Act, it was required to demonstrate . . . 'that the defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product[] . . . .'"  (quoting *Sally Beauty Co., Inc. v. BeautyCo, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002))).  Section 43(a) of the statute, 15 U.S.C. § 1125(a), "creates two distinct bases of liability: false

10

association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark*

*Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ----, 134 S. Ct. 1377, 1384

(2014); *see Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 n.3 (10th Cir.

1999) ("The Act 'principally provides for two distinct causes of action: false

designation of origin or source, known as "product infringement," and false

description or representation, known as "false advertising."'" (quoting *Res.*

*Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 139

(2d Cir. 1991))).

Only the second basis for imposing Lanham Act liability—false

advertising—has been argued in this case. Relevant to our assessment of the

false-advertising theory, the statute provides that liability in a civil action

attaches to:

> Any person who, on or in connection with any goods or services[] . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which—
>      . . .
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[] . . . .

15 U.S.C. § 1125(a)(1). A Lanham Act claim may be brought "by any person

who believes that he or she is or is likely to be damaged by such act." *Id.*

Nonetheless, "[t]hough in the end consumers also benefit from the Act's proper

enforcement, the cause of action is for competitors, not consumers." *POM*

11

*Wonderful*, 134 S. Ct. at 2234; *see Lexmark*, 134 S. Ct. at 1390 ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act—a conclusion reached by every Circuit to consider the question.").

Thus, to state a false-advertising claim under § 43(a) of the Lanham Act, a plaintiff must plausibly allege:

> (1) that [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff.

*Cottrell*, 191 F.3d at 1252 (citations omitted); *accord La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1181 (10th Cir. 2009). Each of the foregoing elements must be demonstrated by a preponderance of the evidence. *See World Wide Ass'n of Specialty Programs*, 450 F.3d at 1140 ("[I]n order for World Wide to succeed on [a] claim under the Lanham Act, it was required to demonstrate the . . . elements by a preponderance of the evidence[] . . . .").

Delving into the threshold component of a Lanham Act claim (i.e., advertising representations attributed to the defendant), panels of this court have explained that "'Section 43(a) . . . encompasses more than literal falsehoods,' because otherwise, 'clever use of innuendo, indirect intimations, and ambiguous

12

suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed.'" *Cottrell*, 191 F.3d at 1252 (quoting *Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978)); *see also Zoller Labs., LLC v. NBTY, Inc.*, 111 F. App'x 978, 982 (10th Cir. 2004) (unpublished) ("To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was *literally* false, either on its face or by necessary implication, *or* that the statement was literally true but likely to mislead or confuse consumers." (emphases added) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997))). More specifically, the Lanham Act contemplates *two* variants of actionable advertising representations: (1) those that are literally false, and (2) those that, while literally true, are likely to mislead and confuse consumers. *See La Resolana Architects, PA*, 555 F.3d at 1181–82 (holding there was "no basis" for a Lanham Act claim, given the district court's factual findings that "neither [of the defendants] made any false or misleading oral or written statements or representations"); *see also Hutchinson v. Pfeil*, 211 F.3d 515, 522 (10th Cir. 2000) (noting the two different categories and collecting cases).

**B**

Having set out the essential legal principles underlying this appeal, we proceed to the merits of Plaintiffs' Lanham Act claim. As noted, the district court deemed this claim legally infirm due to Plaintiffs' failure to plausibly allege that

13

Intermountain made *any* materially false or misleading representations concerning the quality of its stroke and TIA services. We agree. To be more precise, we agree that: (1) Intermountain's general marketing claims are not particular enough to constitute literally false representations, and (2) Intermountain's more specific statements are true and not misleading.[3] This failing by Plaintiffs obviates the need for us to determine whether Plaintiffs properly pleaded a cognizable Lanham Act injury, so we decline to address the issue. Accordingly, for the reasons that follow, we affirm the district court's decision to dismiss Plaintiffs' Lanham Act claim against Intermountain with prejudice.

**1**

First, we address Plaintiffs' endeavor to forge a Lanham Act claim by invoking Intermountain's general advertising and marketing representations concerning quality of care. At the motion-to-dismiss stage, the district court determined that none of the vague declarations that Plaintiffs identified were "statements of fact for which [Intermountain] c[ould] be held liable under the

---

[3]    In the analysis that follows, we employ the district court's helpful categorization of the challenged statements—*viz.*: (1) general marketing statements; and (2) specific statements concerning (a) the number of stroke and TIA specialists at Intermountain; (b) Intermountain's Ethics Code; and (c) Intermountain's Stroke Pamphlet. Intermountain contends that Plaintiffs have not challenged the district court's rulings concerning the latter (i.e., the specific statements) on appeal. Plaintiffs, however, argue to the contrary in their Reply Brief. Though Plaintiffs' briefing regarding the three sets of specific statements is far from artful, we need not detain ourselves with the question of waiver *vel non*; even if Plaintiffs have not waived their challenges relative to the specific statements, the challenges fail on the merits.

14

Lanham Act"; to the contrary, they were expressions of sales "puffery." Aplt. App. at 16. We, too, conclude that the marketing representations at issue are merely expressions of Intermountain's *opinion*. This leads inexorably to the conclusion that, as a matter of law, these general statements cannot be "material false or misleading representations of *fact*." *Cottrell*, 191 F.3d at 1252 (emphasis added). As such, they cannot form the basis of a false-advertising Lanham Act claim.

Intermountain's public-relations efforts involved a publicly accessible, comprehensive website. On the website's home page, Intermountain held itself out as "an internationally recognized, nonprofit system of 22 hospitals, a Medical Group with more than 185 physician clinics, and an affiliated health insurance company." Aplt. App. at 308 (Website Home Page, dated Sept. 5, 2013). The home page indicated that Intermountain "offer[s] a full range of services" and that "[p]roviding excellent care of the highest quality at an affordable cost is at the heart of [its] mission." *Id.* Similarly, the website section focusing on Intermountain's clinics declared, "Our network of experienced doctors, surgeons and caregivers strive[s] to provide clinically excellent healthcare through a wide range of services in a setting where patient needs come first." *Id.* at 311 (Clinics Subpage, dated Sept. 5, 2013).

Elsewhere on its website—on a subpage denominated "For Intermountain Healthcare Trustees"—Intermountain described its business model as "[a]n

15

[i]ntegrated [h]ealthcare [s]ystem"; by virtue of such amalgamation, it was said to offer its clientele "[c]linical quality," "[s]ervice quality," "[l]ower costs," "[p]revention," and "a relatively seamless continuum of care." *Id.* at 313 (Trustee Subpage, dated Sept. 5, 2013). There, Intermountain claimed that being a vertically-integrated network enabled it to "contribute in essential ways to the sharing of best medical practices, and raising the standards of clinical excellence." *Id.* It further asserted that, "[b]y identifying and implementing best medical practices[,] . . . Intermountain not only provides quality healthcare; it often achieves lasting improvement in cost structures." *Id.*

Plaintiffs contend that all of the foregoing representations—that is, Intermountain's "claims to identify and implement best medical practices at the lowest available cost"—are "literally false statement[s]" upon which a legitimate Lanham Act false-advertising claim may be predicated. Aplt. Opening Br. at 58–59; *see id.* at 31 (alluding to Intermountain's purported "literally false general advertisements of best medical practices, exceeding the standard of care, delivering the best possible care and . . . delivering high quality care in all services at affordable costs" (footnotes omitted)). We reject Plaintiffs' position. We conclude that Intermountain's general quality-of-care declarations are emblematic of sales puffery; for that reason, we cannot classify these declarations as statements of fact, much less literally false ones.

16

**a**

Intermountain's general advertising statements fall short of our Lanham Act standard because they constitute sales puffery and, as such, cannot be deemed statements of fact, let alone literally false ones.

**i**

In a well-known Lanham Act case, the Fifth Circuit has helpfully laid the groundwork for a discussion of puffery:

> Essential to any claim under section 43(a) of the Lanham Act is a determination of whether the challenged statement is one of fact—actionable under section 43(a)—or one of general opinion—not actionable under section 43(a). Bald assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000).

"Puffery" is a term of art "used to characterize those vague generalities that no reasonable person would rely on as assertions of particular facts." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009); *see Puffing*, Black's Law Dictionary (10th ed. 2014) (noting that the term, or its alternative "*puffery*," means "[t]he expression of an exaggerated opinion—as opposed to a *factual* misrepresentation—with the intent to sell a good or service" and stating that such statements "remain[ ] in the realm of opinion or belief" (second emphasis added) (quoting Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 369 (3d ed. 1982))).

17

As the Third Circuit has explained (in a Lanham Act lawsuit), a statement of puffery "is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 109, at 756–57 (5th ed. 1984)). The hallmarks of puffery are "broad, vague, and commendatory language," *id.*, as well as "[s]ubjective claims . . . which cannot be proven either true or false," *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (alteration in original) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)).

We recognize that the Tenth Circuit has not yet defined the precise contours of puffery in a false-advertising Lanham Act case. However, our caselaw involving puffery in other causes of action makes clear to us that Intermountain's general advertising claims of best practices and high-quality customer service fit the bill (i.e., constitute puffery). *See, e.g.*, *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1114 (10th Cir. 2014) (accepting securities treatise's statement that puffing is not actionable as an "untrue statement of a material fact" under 15 U.S.C. § 77k); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (classifying as puffery "vague (if not meaningless) management-speak," including the defendant's statement that it was "focused on insuring . . . the excellent

18

reputation that [it] ha[d] earned over the years for customer service," and noting

that "broad claims . . . regarding . . . the customer experience overall are likewise

non-actionable" under 15 U.S.C. § 78j(b) (quoting the record)); *Grossman v.*

*Novell, Inc.*, 120 F.3d 1112, 1121–22 (10th Cir. 1997) (holding that a company's

general claims that it offered "a compelling set of opportunities" and had

"experienced substantial success" were "soft, puffing statements, incapable of

objective verification" for purposes of 15 U.S.C. § 78j(b)).  In other words, our

caselaw counsels in favor of blessing the district court's conclusion that

Intermountain's general statements at issue here equate to puffery—which makes

them legally non-objectionable.  *See* 1A Louis Altman & Malla Pollack,

*Callmann on Unfair Competition, Trademarks and Monopolies* § 5:26, at 5-155

(4th ed. 2007) ("The law of unfair competition does not forbid [sales] puffing.").

Our decision in *Alpine Bank* helpfully reinforces the conclusion that

Intermountain's general advertising declarations constitute puffery.  In *Alpine*

*Bank*, the cause of action was negligent misrepresentation under Colorado law.

Succeeding on that claim would have required the plaintiffs to establish, *inter*

*alia*, justifiable reliance on false business information supplied by their bank, the

defendant.  *See Campbell v. Summit Plaza Assocs.*, 192 P.3d 465, 477 (Colo. App.

2008) ("To prevail on a claim for negligent misrepresentation . . . , [the plaintiff]

was required to prove that . . . [the defendant] supplied false information in a

business transaction[] . . . .").  We rejected the plaintiffs' argument that the bank

19

had furnished actionable false information through the following advertising slogan: "[Y]ou're about to buy a new home, or build one.  You concentrate on your dream.  We'll take care of everything else."  *Alpine Bank*, 555 F.3d at 1106.  Critically, we reasoned that "this slogan cannot trigger liability because it amounts to mere puffery."  *Id.*

Analyzing the *Alpine Bank* plaintiffs' claims within the construct of puffery, we intimated that the concept of sales puffery "has not changed that much in the last century."  *Id.*  We alluded to the importance of context in determining whether a transactional representation constitutes puffery:

> What is said to a particular person may take on meaning that would not be present if made to a large group.  Thus, *mass advertising expressed in vague terms . . . is not relied on by rational adults*.  For example, the slogan "You're in good hands with Allstate" was held to be puffery . . . .  One reason such statements are not to be relied on is that they could not possibly mean everything that might be implied.

*Id.* at 1107 (emphasis added) (citation omitted).  Then, placing the bank's averments in proper context, we found it patent that a prospective homeowner seeking a loan from his bank would *not* reasonably expect the bank to shepherd him through the entire process of "build[ing] the home, choos[ing] a site, select[ing] the builder, [and] supervis[ing] construction."  *Id.*  We thus held that "[a] reasonable person desiring [a defendant] to perform in a particular way *would need a more specific assurance*" than a simple claim of superior quality, such as the one presented in the bank's advertising materials.  *Id.* (emphasis added).

20

We discern no cogent reason to disregard these broadly applicable lessons from *Alpine Bank* in the context of this case—i.e., a false-advertising Lanham Act claim against a defendant hospital network. Healthcare is fraught with unpredictability, and a healthcare-delivery system hardly strikes us as the species of business from which a particular objectively-superior result (e.g., with respect to certain stroke and TIA treatments) could reasonably be expected by a consumer without at least some modicum of specificity being provided by the business in its representations (or, as *Alpine Bank* put it, in its "assurance"). Accordingly, though *Alpine Bank* did not resolve a Lanham Act claim, we consider its guidance in reaching our conclusion that Intermountain, through its *general* marketing declarations, did not "ma[k]e material false or misleading representations of fact . . . that [we]re . . . likely to cause confusion or mistake as to . . . the characteristics of the goods or services." *Cottrell*, 191 F.3d at 1252 (citations omitted).

In any event, even without the benefit of *Alpine Bank*, we would conclude that advertising declarations about "best medical practices, exceeding the standard of care, delivering the best possible care and . . . delivering high quality care in all services," Aplt. Opening Br. at 31 (footnotes omitted)—all of which speak generically to the caliber of the Intermountain brand—are classic puffery. Our sibling circuits have regularly reached similar conclusions when reviewing such statements—that is, they have concluded that analogous statements are incapable

21

of objective verification and constitute puffery.[4]  The Fifth Circuit's reasoning in

---

[4]  We have discovered several persuasive decisions from our sister circuits in our study of puffery.  Concluding, as we do, that Intermountain's general advertising statements (concerning best practices and brand quality) amount to puffery places us in accord with these courts.  *See, e.g.*, *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) ("'America's Favorite Pasta' is not a specific, measurable claim and cannot be reasonably interpreted as an objective fact. . . .  'Well liked' and 'admired' do not convey a quantifiable threshold in sheer number, percentage, or place in a series."); *Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1008 (7th Cir. 2004) ("The phrase 'high quality' is highly subjective. . . .  it comes under the category of sales puffery . . . ."  (citation omitted)); *Pizza Hut*, 227 F.3d at 498 ("[I]t appears indisputable that Papa John's assertion 'Better Pizza.' is non-actionable puffery."); *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000) (per curiam) (opining that a reasonable consumer would not interpret the phrase "1st Choice of Doctors" as a "claim [that] either was false or implied a falsehood"); *In re The Bos. Beer Co. Ltd. P'ship*, 198 F.3d 1370, 1373–74 (Fed. Cir. 1999) (agreeing that "'The Best Beer in America' is a generally laudatory phrase" that is "nothing more than a claim of superiority," and equating such "[s]elf-laudatory" statements to "puffing"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (viewing statements of optimism about earnings such as "*should* deliver income growth consistent with its historically superior performance" as mere "puffery" because they "lack the sort of definitive positive projections that might require later correction" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993))); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (per curiam) ("[A]ny implication that can be drawn from [the defendant's] advertisement regarding [its] lower costs and superiority over [competitors] constitutes puffery and is not actionable as false advertising under Section 43(a) of the Lanham Act."); *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 926 (3d Cir. 1990) (characterizing advertisements with the slogan "Better than HMO.  So good, it's Blue Cross and Blue Shield." as "the most innocuous kind of 'puffing,' common to advertising and presenting no danger of misleading the consuming public," and "[c]onsequently, . . . find[ing] that no cause of action lies"); *cf. Pennzoil Co.*, 987 F.2d at 946 ("Pennzoil's claim of engine protection . . . .  is both specific and measurable by comparative research.  In fact, Pennzoil seeks to substantiate its claims of superiority by reference to testing.  This . . . defeats Pennzoil's assertion that its claims constitute only puffery.").

22

*Pizza Hut*, 227 F.3d 489, is especially helpful in that regard.

*Pizza Hut*'s false-advertising Lanham Act dispute centered around the slogan of Papa John's Pizza: "Better Ingredients.  Better Pizza."  227 F.3d at 491.  After a jury found that this catchphrase, standing alone, was a false statement of fact, the district court enjoined its use.  But the Fifth Circuit disagreed, concluding that both sentences in the slogan fit the definition of puffery by "epitomiz[ing] the exaggerated advertising, blustering, and boasting by a manufacturer upon which no consumer would reasonably rely." *Id.* at 498.  The court expressly referenced leading unfair-competition and tort-law treatises, noting that these well-regarded authorities had defined puffery in the foregoing manner and had persuaded the court that Papa John's vague slogan "c[ould] be understood as nothing more than a mere expression of opinion." *Id.* at 497.  More specifically, the court reasoned, an adjective like "better" could not be factual in nature because it was "unquantifiable" and thus, "without further description, [wa]s wholly a matter of individual taste or preference not subject to scientific quantification. . . .  [and consequently] not actionable under the Lanham Act." *Id.* at 499 (citation omitted).

Drawing guidance from the Fifth Circuit's decision in *Pizza Hut*, we consider Intermountain's general declarations concerning best practices and high-

23

quality care to be merely sales puffery that cannot form the basis of a Lanham Act

claim.[5]

---

[5]     Indeed, we have serious doubts about whether Intermountain's *general* declarations of this sort (e.g., promoting its adherence to "best medical practices") could be shown to be factually false in this specific context. Neither the plain terms of these declarations nor the necessary implications from the terms evince a specific nexus to Intermountain's stroke and TIA services. Plaintiffs have pleaded no facts to the contrary; instead, they have relied on conclusory averments, and that is not enough. *See, e.g.*, Aplt. App. at 271 ("While its institutional ad campaign is focused on the Intermountain Healthcare brand and *not* on specific services or offerings, such as post-stroke or TIA care[] . . . . consumers will take Intermountain Healthcare's broad message and apply it to specific products and services Intermountain Healthcare offers . . . ." (emphasis added)). Therefore, even if Intermountain has violated some particularized medical standard of care associated with stroke and TIA treatment, as Plaintiffs allege, that would not necessarily mean that its *general* representations of quality of care are factually false. *See, e.g.*, *Euro-Pro Operating LLC v. TTI Floor Care N. Am.*, No. 12-10568-DJC, 2012 WL 2865793, at *15 (D. Mass. July 11, 2012) (noting that the challenged advertisement "does not explicitly state that it is being conducted pursuant to any specific industry standard . . . , so the [product] demonstration's alleged violation of industry standards does not by itself provide the basis for a literal falsity claim"). In other words, the ostensible existence of violations of stroke and TIA standards of care would not necessarily indicate that, *in the aggregate*, Intermountain's healthcare services are beneath "best medical practices." Furthermore, even assuming *arguendo* that such general quality-of-care claims implicate standards of care akin to those in the medical-malpractice arena (as Plaintiffs suggest), the determination of what those standards are and whether they have been violated would typically rest on expert-opinion testimony. *See, e.g.*, *Jensen v. IHC Hosps., Inc.*, 82 P.3d 1076, 1096 (Utah 2003) ("Unless 'the propriety of the treatment received is within the common knowledge and experience of the layman,' the plaintiff is required to prove the standard of care through an expert witness who is qualified to testify about the standard." (quoting *Jennings v. Stoker*, 652 P.2d 912, 914 (Utah 1982))); *see also Nixdorf v. Hicken*, 612 P.2d 348, 351–52 (Utah 1980) (noting that plaintiffs "must establish both the standard of care required of the defendant . . . in the community and the defendant's failure to employ that standard," and that "[i]n the majority of medical malpractice cases the plaintiff must introduce expert testimony to establish th[e] standard of care").

(continued...)

Generously construing Plaintiffs' contrary arguments, we reject them:

First, in attacking the district court's puffery determination, Plaintiffs repeatedly refer to puffery as "a defense." Aplt. Opening Br. at 31. They appear to contend that it is an affirmative defense that must be shouldered by Intermountain and, therefore, has no bearing on the question of whether Plaintiffs have pleaded a plausible Lanham Act claim (that is, successfully averred sufficient facts to legally support such a claim). Plaintiffs are wrong. We are aware of no legal authority that validates this proposition, and Plaintiffs offer none. To be sure, in this connection, they do cite *Pizza Hut*; however, there is nothing in that case that even remotely validates their characterization of puffery as an affirmative defense. Indeed, the Fifth Circuit made clear in *Pizza Hut* that the concept of puffery pertains to whether the statements that plaintiffs identify are actually actionable. *See Pizza Hut*, 227 F.3d at 496 ("One form of non-actionable statements of general opinion under section 43(a) of the Lanham Act has been referred to as 'puffery.'"). Accordingly, we reject Plaintiffs' characterization of puffery as a defense.

Second, we cannot accept Plaintiffs' contention that the statements concerning best practices and high-quality care are not puffery because they are

---

[5](...continued)
In other words, such determinations would ultimately be based on opinions, not facts—which are the essential ingredient of any Lanham Act claim.

not "forward-looking." Aplt. Opening Br. at 61. In this regard, Plaintiffs are seemingly relying on our *Grossman* decision. *See* 120 F.3d at 1119. However, such reliance is misguided. In *Grossman*, a securities-fraud case, the statements alleged to be "false and misleading" concerned the defendant's potential market-share gain, "compelling" opportunities, "smooth[ ]" mergers, and "accelerating" product development. *Id.* at 1116–17. We disposed of the plaintiff's claims not only by agreeing with the district court that most of the challenged representations were "[v]ague, optimistic statements [that] [we]re not actionable because reasonable investors do not rely on them in making investment decisions," but also by affirming, on the alternative ground, that several statements "were properly dismissed . . . because [the plaintiff] ha[d] not made sufficient allegations that many of the statements were actually false." *Id.* at 1119. In the context of this analysis, we observed that "[s]tatements classified as 'corporate optimism' or 'mere puffing' are *typically* forward-looking statements." *Id.* (emphasis added). But that stray excerpt from *Grossman* can only be rightly understood when read in the context of the sentence containing it.

Specifically, that sentence reads: "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, *or are generalized statements of optimism* that are not capable of objective verification." *Id.* (emphasis added). That *Grossman* "employs disjunctive terminology," *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1204 (10th Cir. 2015), is significant.

26

We certainly did *not* hold in *Grossman*, as Plaintiffs appear to suggest, that *only* "forward-looking" statements can be puffery. To the contrary, we immediately indicated that "vague statements of corporate optimism" also qualify, and we referenced numerous cases wherein hopeful language—some remarkably similar to the marketing statements identified in this lawsuit—was deemed to be puffery. *See Grossman*, 120 F.3d at 1119–20 (collecting cases). For this reason, we are satisfied that *Grossman*'s "forward-looking" language does not control whether a statement may be properly considered puffery. *Grossman* does not alter our view that Intermountain's general claims regarding brand quality are classic puffery.

And, third, we reject Plaintiffs' suggestion that the Supreme Court's holding in *Lexmark* somehow changed the legal framework that the district court should have applied. Plaintiffs urge, somewhat enigmatically, that:

> [i]ncluding a requirement for a plaintiff to establish that a literally false advertisement is "likely to cause confusion or mistake" was rejected in [*Lexmark*]. . . . If the "likely to cause confusion or mistake" phrase is not found in Section 43(a)(1)(B) of the Lanham Act, and is not an element of a false advertising claim, for the purposes of a puffery defense, what a reasonable consumer would believe is irrelevant.

Aplt. Opening Br. at 30–31.

We deem this undeveloped argument unpersuasive. The central issue in *Lexmark* was standing *vel non* to assert a Lanham Act claim, *not* whether the proposed claim, if entertained at all, should be rebuffed as sales puffery. *See Lexmark*, 134 S. Ct. at 1385 ("We granted certiorari to decide 'the appropriate

27

analytical framework for determining a party's standing to maintain an action for false advertising under the Lanham Act.'" (quoting Pet. for Cert.)). That is, *Lexmark* did not endeavor to craft a rule concerning puffery. Rather, its holding—"that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising[, which] occurs when deception of consumers causes them to withhold trade from the plaintiff," *id.* at 1391—squarely implicates whether "the plaintiff is [even] entitled to an opportunity to prove" the Lanham Act claim in the first instance, *id.* at 1391 n.6. *Lexmark*'s obvious focus on the threshold issue of standing, a matter that "must be addressed before proceeding to the merits," *Carolina Cas. Ins. Co. v. Pinnacol Assurance*, 425 F.3d 921, 926 (10th Cir. 2005), belies Plaintiffs' insistence that *Lexmark* supports their merits-based arguments. We consider *Lexmark* completely inapposite to the question of whether Intermountain's general advertising statements can be considered puffery.

In sum, we agree with the district court's ruling insofar as the court deemed Intermountain's general advertising declarations puffing statements that cannot give rise to a Lanham Act false-advertising claim.

**2**

Turning to the three sets of specific averments Plaintiffs challenge, we likewise conclude that they do not rise to the level of actionable Lanham Act

28

conduct. We conclude that each of the three sets of particularized statements fails to state a Lanham Act false-advertising claim and that they indisputably founder on the first element of such a claim because they are true and not misleading. Stated otherwise, we hold that the statements discussed below are not "false or misleading" within the meaning of the statute. 15 U.S.C. § 1125(a)(1).

**a**

First, Plaintiffs assert that Intermountain inappropriately and misleadingly communicates on its website, and in its Annual Stroke Report, that it employs more physicians for stroke and TIA care than it actually does. They claim that these materials contain at least two varieties of actionable Lanham Act representations: (1) misleading suggestions that Intermountain's heart and vascular surgeons specialize in stroke and TIA care, and (2) misleading suggestions that neurologists at Intermountain's Outpatient Neuroscience Clinic are stroke and TIA "subspecialists." Plaintiffs contend that the website and Annual Stroke Report deceive consumers about Intermountain's capacity to provide care when Intermountain purportedly "does not have the physicians needed to provide timely treatment for approximately 800 to 900 stroke patients per year." Aplt. Opening Br. at 22. We disagree: because these statements are true and not misleading, as a matter of law, we cannot accept them as the predicate for a Lanham Act claim.

29

According to Plaintiffs, Intermountain's listing of stroke on its website "under 'Heart and Vascular Services.' . . . is apt to confuse stroke and TIA patients into believing that cardiologists and other heart specialists specialize in the treatment of stroke and TIA, which is not accurate." *Id.* at 18–19. Plaintiffs similarly aver that "the 'Find a Doctor' link from the [Intermountain] website . . . lists heart and vascular surgeons . . . as stroke treatment providers," which "is calculated to mislead or confuse [Intermountain] stroke and TIA patients into believing that a wide range of physicians are available to treat them for stroke and TIA." *Id.* at 19–20. Both contentions lack merit.

Having explored Intermountain's website via the parties' record submissions, we strongly doubt that reasonable healthcare consumers would be deceived in the manner described by Plaintiffs. Plaintiffs' own evidence supports our conclusion that any association of stroke and TIA with "heart and vascular" services is proper. *See, e.g.*, Aplt. App. at 318–19 (medical study discussing stroke and TIA in the context of various cardiovascular indications). It is apparent to us that Intermountain's choice to list stroke under "Heart and Vascular Services" stems from truth, rather than falsity. Because it is true and correct to characterize stroke as a cerebrovascular or cardiovascular disorder, it follows that stroke patients could not have been misled by a suggestion that a vascular physician might be of assistance.

It likewise strikes us as obvious that Intermountain's website's "Find a Doctor" tool contains no misleading information. At all times relevant to this lawsuit, clicking on the "Find a Doctor" link, which was accessible from Intermountain's "Heart and Vascular Services" webpage, would produce a list of physicians. *See id.* at 394. Selecting any physician-specific link would bring up information regarding that physician's educational background, certifications, and clinical interests. After perusing the list of physicians presented, we are not persuaded that it contains any untrue statements when judged in the context of Plaintiffs' Lanham Act claim. Notably, none of the "primary specialty" notations explicitly include a particular physician's claim of expertise in stroke and TIA treatment. Therefore, the most that can be said of these online representations is that they indicate that certain physicians possess the core competencies to treat cerebrovascular diseases. And that appears to be true.

Importantly, at no point during these proceedings have Plaintiffs explained how consumers might infer that the physicians identified by Intermountain were in fact "specialists . . . in the treatment of stroke and TIA." Aplt. Opening Br. at 19. Perhaps Plaintiffs wish that Intermountain had included some sort of disclaimer—such as "Dr. X is not a stroke specialist"—but they have never argued or briefed such a proposition. We suspect that this is so because the sparse extant caselaw would not support it. *Cf., e.g.*, *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 235, 238 (2d Cir. 1974) (rejecting attempt to

31

shoehorn a Lanham Act claim from allegations of selling tobacco "without taking effective steps to warn their customers that the tobacco had been subjected to possible water damage"); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 286 (S.D.N.Y. 2007) (noting the unavailability of a viable action under § 43(a) of the Lanham Act for not disclosing facts).

In addition, Plaintiffs direct our attention to Intermountain's Annual Stroke Report, which states in relevant part: "The Stroke Program also offers resources for patients with ongoing medical needs after hospitalization. The Outpatient Neuroscience Clinic[] . . . is home to subspecialists including epileptologists, general neurologists, physical medicine and rehabilitation physicians, and neuropsychologists." *Id.* at 349 (Annual Stroke Report, dated 2011). Plaintiffs seemingly take issue with Intermountain's description of staff neurologists as "subspecialists," despite the fact that those physicians held themselves out as focusing on specified brain disorders. Without more explication from Plaintiffs, we cannot seriously entertain this argument. In our view, no misleading message can be gleaned from these statements. A straightforward interpretation of the foregoing Annual Stroke Report passage is that Intermountain employs staff physicians whose *own* subspecialties may be of particular benefit to patients assessing "ongoing medical needs" after a stroke. *Id.* That language is certainly not an explicit or implicit representation that Intermountain's Outpatient Neuroscience Clinic is a "resource[ ]," *id.*, solely pertaining to stroke and TIA.

32

At bottom, all of the challenged statements regarding Intermountain's cadre of physicians contain true information that is not misleading. For that reason, the specific statements are not actionable for purposes of a Lanham Act claim.

**b**

Plaintiffs also insist that Intermountain falsely claims in its Ethics Code to "carefully review financial relationships with physicians and other Health Care Practitioners for compliance with the anti-kickback and Stark laws." Aplt. App. at 888. In this regard, Plaintiffs note that Intermountain reached a settlement with regulators regarding certain of its compensation arrangements that appeared to contravene the federal healthcare-fraud statutes. However, we echo the district court's view that "the [Ethics Code] claims are true and not misleading." *Id.* at 23.

From our perspective, Intermountain's announcement of its intent to behave ethically falls entirely outside the purview of a Lanham Act false-advertising claim. A district court opinion from within our circuit offers convincing reasons to support this conclusion:

> Plaintiff's Consolidated Complaint alleges that the Board's announcement of its adoption of a code of ethics in its third quarter 2004 Form 10-Q was false and misleading, because the Company failed to reveal ongoing significant breaches of the Code by [specified individuals]. . . . [T]he Code of Ethics essentially reaffirms state law fiduciary duties of the Company's officers[] . . . .

33

> A company's essentially mandatory adoption of a code of ethics simply does *not* imply that all of its directors and officers are following that code of ethics. . . . Further, *a code of ethics is inherently aspirational*; it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all, particularly when the adoption of such a code is effectively mandatory.

*Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007) (emphases added) (citations omitted).

Most relevant here, the notion that Intermountain's Ethics Code is "inherently aspirational," *id.* at 686, finds support in the record. The Ethics Code begins with a statement of purpose that sets behavioral expectations for Intermountain employees. *See* Aplt. App. at 409 (stating that "employees[] . . . must accept personal responsibility to act with the utmost integrity" and that "[c]opies of Intermountain's Code of Ethics are provided to ensure that we all clearly understand our responsibilities"). It contemplates "consequences of misconduct" as well. *Id.* By doing so, the Ethics Code (at least tacitly) acknowledges that Intermountain's standards are sometimes violated; such violations trigger corrective action. This is precisely what happened when Intermountain became aware of and responded to compensation arrangements that appeared to contravene the federal healthcare-fraud statutes, entering into a settlement agreement with federal regulators. *See id.* at 438–48 (Settlement Agreement, dated Mar. 28, 2013) (representing Intermountain's disclosure to the Department of Health and Human Services that it submitted claims for payment

34

"that may have been unlawful" and its agreement to repay the United States over $25 million). Indeed, the very existence of the resulting settlement agreement evinces the truthful spirit underlying Intermountain's Ethics Code. *Cf. id.* at 410 ("[W]e report observed and suspected violations of laws or policies[] . . . .").

Quite simply, we consider nothing false or misleading about Intermountain's Ethics Code in the context of the false-advertising section of the Lanham Act. Aspirational statements announcing Intermountain's intent to comply with the federal healthcare-fraud statutes—laws which are not otherwise at play in this appeal—do not implicate whether Intermountain has "misrepresent[ed] the nature, characteristics, qualities, or geographic origin of [its] . . . services." 15 U.S.C. § 1125(a)(1)(B). Rather, these Ethics Code representations explain Intermountain's professed general strategy for conducting ethical business and its intent to be forthcoming about any missteps along the way. They are hence inapposite to the question of whether Plaintiffs have pleaded "that [Intermountain] made material false or misleading representations of fact in connection with the commercial *advertising or promotion of [stroke and TIA care]* . . . [that] injure[d] the plaintiff[s]." *Sally Beauty Co.*, 304 F.3d at 980 (emphasis added). Consequently, the statements in Intermountain's Ethics Code were properly deemed insufficient to support a Lanham Act claim.

## c

The last challenged set of specific advertising averments stems from Intermountain's Stroke Pamphlet. The target audience for this thirty-six-page document includes stroke and TIA patients who have been admitted to an Intermountain facility, as well as their family members and friends. *See* Aplt. App. at 357 (Stroke Pamphlet, filed Oct. 7, 2013) ("After a stroke, you and your loved ones may feel uncertain . . . . This booklet can help."). It contains background material on strokes and TIAs, a "Stroke Recovery Checklist," an index of stroke resources, and other general information concerning "[a]ftercare." *Id.* (emphasis omitted).

According to Plaintiffs, page ten of the Stroke Pamphlet—an "Aftercare" chart—contains the legally actionable language for their Lanham Act claim. That page indicates that "an appointment with" a patient's primary care provider "is *usually* recommended 1 to 7 days after [leaving] to go home" and, similarly, that visiting a neurologist "is *usually* recommended" "4 to 6 weeks after [leaving] to go home." *Id.* at 364 (capitalization altered) (emphases added). Plaintiffs insist that these statements constitute false advertising because "[e]ven if these guidelines apply[,] . . . . a TIA patient who reads this pamphlet is likely to be under the mistaken impression that he or she can safely wait 4 to 6 weeks before following up with a neurologist." Aplt. Opening Br. at 17. Once again, we disagree.

36

From our perspective, the "Aftercare" chart in the Stroke Pamphlet cannot be legally actionable under the Lanham Act for one simple, yet crucial, reason: it nowhere purports to stake a position on "the nature, characteristics, [or] qualities[] . . . of [Intermountain's] . . . services." 15 U.S.C. § 1125(a)(1)(B). *No references to Intermountain appear on that page of the document.* In fact, having reviewed the entire Stroke Pamphlet, we note that Intermountain names itself only on the title page, in one very small "Call 911!" icon, and at the end, as one of "*many organizations* that support people who've had a stroke." Aplt. App. at 355, 379, 389 (emphasis added). In other words, we are not persuaded that this document stands as an obvious endorsement of Intermountain's services.

Moreover, we would be hard-pressed to determine that this particular "Aftercare" chart upon which Plaintiffs focus could mislead anyone about the scope of Intermountain's services. Indeed, we conclude that it could not mislead a reasonable consumer about Intermountain's overarching medical services *or* its more specific stroke and TIA services (i.e., the subset of services germane to these proceedings). It seems most accurate to characterize this portion of the Stroke Pamphlet as a rudimentary worksheet suggesting how patients *might* approach post-stroke or post-TIA life; that is far too vague to support a Lanham Act claim. In any event, assuming that the average reader of the Stroke Pamphlet has reached the chart on page 10, it stands to reason that she has also read the disclaimer on page 3 stating that "this booklet *doesn't replace the specific*

37

*instructions* you will receive from your healthcare providers," which need not be Intermountain providers. *Id.* at 357 (emphasis added).

In sum, we conclude that the statements identified in the Stroke Pamphlet cannot form the basis of a cognizable Lanham Act claim because they are *not* misleading. Most importantly, for purposes of a Lanham Act claim, we discern no expression in the Stroke Pamphlet's statements related to the nature, characteristics, or qualities of Intermountain's healthcare services, and we therefore see nothing *misleading* about those statements. Thus, we consider the district court's rejection of this aspect of Plaintiffs' claim unassailable.

Accordingly, we uphold the district court's rulings wherein the court concluded that none of the "specific" advertising statements could serve as the predicate for a Lanham Act false-advertising claim.

**3**

Because we have explicated in detail why the district court properly dismissed Plaintiffs' Lanham Act claim for insufficient averments concerning the first element of such a claim, we need not (and thus do not) opine upon whether Plaintiffs sufficiently alleged a legally actionable injury under the statute. We are content to affirm the district court's order on the first element, without addressing any other aspects of the district court's order.

38

## III

We **AFFIRM** the judgment of the district court.

Entered for the Court

JEROME A. HOLMES
Circuit Judge